In the Matter of Denis Edward
BOWYER, Debtor.

NCNB TEXAS NATIONAL BANK,
formerly First Republicbank
Austin, Appellant,

v.

Denis Edward BOWYER, Appellee.

No. 89–7029.

United States Court of Appeals,
Fifth Circuit.

Nov. 14, 1990.

Joanalys B. Smith, Thomas T. Rogers, Small, Craig & Werkenthin, Austin, Tex., for appellant.

William C. Davidson, Jr., Austin, Tex., for appellee.

Before WISDOM, DAVIS, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

Appellant NCNB objected to Dr. Bowyer's discharge in his Chapter 7 bankruptcy proceeding; but, the bankruptcy court allowed it, and the district court affirmed. Because Bowyer's use of non-exempt funds on the eve of bankruptcy, including conversion to exempt assets (such as satisfaction of his homestead mortgage), constituted intent to hinder or delay a creditor, we REVERSE.

## I.

Bowyer, an anesthesiologist, was a member of Capitol Anesthesiology Association (CAA), a professional corporation. In 1985 and in 1986, his yearly income was $230,000. He testified that expenses exceeded income by approximately $2,000 each month, but that he and his family had a modest lifestyle.[1]

In 1983, Bowyer purchased 12 condominiums with a loan from a predecessor of NCNB (the Bank), in the amount of $560,000.[2] In 1986, the Bank consented to the sale of one of the condominiums, which netted only 50 cents on the dollar. In March 1987, Bowyer sold the remaining condominiums at a similarly depressed price, which was less than the outstanding mortgage. The Bank refinanced the entire $342,645.91 deficiency, with Bowyer required to contribute only the net sale proceeds for the refinancing.

The Bank's loan officer testified that the refinancing was based on Bowyer's May 1986 financial statement. The detailed assets included gold Mapleleafs valued at $12,000 and $42,000 in "Cash on Hand and in Banks."[3] Bowyer maintained depository accounts, including a money market fund, with the Bank. He told the Bank that he intended to, and did, maintain at least two quarters worth of loan payments in the money market account; and it contained approximately $41,000 on the date of the 1986 statement. Bowyer's April 1987 financial statement for the Bank listed, among other assets, $60,000 on deposit in the Bank and valued the Mapleleafs at $18,000. In signing the financial statements, Bowyer agreed to inform the bank of any material change in his financial condition.

After the refinancing, Bowyer made monthly payments of $5,585 to the Bank until he filed for bankruptcy in October 1987. In June and July 1987, he also made unscheduled payments to the Bank, reducing the principal by $25,000.

At the time of the refinancing in the spring of 1987, Bowyer was aware of changes in his anesthesiology practice which would decrease his income. In July 1987, he sold the Mapleleafs for approximately $18,000. He did not deposit the proceeds in a bank; instead, his wife carried them in her purse.[4] Moreover, he did

---

1. Bowyer's monthly expenses included approximately $1,200 for his daughter's private school and $800 for recreation.

2. The lending Bank was Interfirst Bank Austin; First RepublicBank purchased Interfirst; and NCNB purchased First RepublicBank.

3. The statement listed his interest in a limited partnership as $60,000, but failed to state that this amount was pledged as collateral on another bank loan. Bowyer also failed to list a general partnership debt of $300,000. His contingent liabilities roughly equaled his net worth.

4. As stated, he had a money market account with the Bank; and it was listed on his 1986 and 1987 financial statements given the Bank, as were the Mapleleafs.

not inform the Bank of this change in his listed assets.

Bowyer spent some of the gold proceeds on travel, including $6,000 to send his wife and three friends to Hawaii. He also used the proceeds to purchase clothing and furniture and housewares for his homestead. That summer, Bowyer also spent an additional $7,000, not part of the gold proceeds, on homestead improvements, including adding a greenhouse.

On September 28, 1987, at Bowyer's professional corporation's (CAA's) retreat, CAA's tax attorney informed him of tax code changes which would decrease his income. Bowyer testified that he then realized that he "might have to go into some sort of bankruptcy." Bowyer met with CAA's tax attorney and a bankruptcy attorney in early October; he paid a retainer to the bankruptcy attorney.

Bowyer's wife withdrew $24,002 from their money market account with the Bank on October 13, 1987. The withdrawal was used to purchase a $24,000 cashier's check, payable to Bowyer's wife, which she endorsed and used to satisfy their homestead mortgage at another bank. Bowyer testified that he did this "to cut down monthly payments"; there had been no demand for payment in full. And, in mid-October, Bowyer spent approximately $4,000 to attend parents' weekend at his daughter's school.

Bowyer filed a Chapter 7 petition on October 28, 1987. The Bank instituted an adversary proceeding, objecting to Bowyer's discharge. The bankruptcy court allowed the discharge, and the district court adopted the bankruptcy court's findings and affirmed.

## II.

Among other assets for which Bowyer could claim an exemption in his Chapter 7 bankruptcy proceeding were those protected by the liberal Texas homestead law. 11 U.S.C. § 522; Tex. Const. art. XVI § 50; *see Matter of Reed,* 700 F.2d 986, 989–91 (5th Cir.1983). Bowyer's improvements to, and purchases for, his homestead in the summer of 1987 and the satisfaction of his homestead mortgage that fall constituted conversion of bankruptcy non-exempt to exempt assets.

At issue is whether Bowyer's use of non-exempt funds, including converting them to such exempt assets, precludes his discharge. Such use, without more, does not. To determine discharge *vel non,* we look to Bankruptcy Code § 727, which provides in part:

(a) The court shall grant the debtor a discharge, unless ... (2) the debtor, with intent to hinder, delay, or defraud a creditor, ... has transferred, removed, ... (A) property of the debtor, within one year before the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A). Bowyer transferred and removed certain of his property within one year of filing; he used the money market proceeds to pay off his homestead mortgage, and spent the gold proceeds and other sizeable sums on homestead improvements and items, on travel, and on nonrecoverable expenses. *Matter of Smiley,* 864 F.2d 562, 565 (7th Cir.1989) (transfer is any disposition of a property interest); 11 U.S.C. § 101(50). Accordingly, we turn to whether he did so "with *intent* to hinder, delay or defraud a creditor." 11 U.S.C. § 727(a)(2)(A) (emphasis added).

The bankruptcy court found that "there seems to be intent to place assets beyond the reach of creditors, this intent goes to pre-bankruptcy planning, not an intent to *defraud.*" (Emphasis added.) That court also found that Bowyer's actions were not a "concerted scheme", as found in *Reed,* discussed below. The Bank contends that pursuant to § 727(a)(2)(A), Bowyer should not have been discharged; that the bankruptcy and district courts erred in finding that Bowyer did not transfer property with intent to hinder, delay, or defraud a creditor.

■ Conclusions of law are subject to plenary review. *Matter of Multiponics, Inc.,* 622 F.2d 709, 713 (5th Cir.1980). On the other hand, "[t]he fact findings of the bankruptcy judge, affirmed by the district

court, are to be credited by [the reviewing court] unless clearly erroneous." *Reed,* 700 F.2d at 992. A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Pursuant to our review of the record, we are left with such a conviction; while there may not have been intent to defraud, there was *intent* to hinder or delay.

### A.

■ "[M]ere conversion [of non-exempt assets] is not to be considered fraudulent [under § 727(a)(2)(A)] unless other evidence proves *actual intent* to defraud creditors." *Reed,* 700 F.2d at 991 (emphasis added). And, a court may infer such actual intent from the circumstances of the debtor's conduct. *Smiley,* 864 F.2d at 566. *See Reed,* 700 F.2d at 991. In *Reed,* the debtor's whole pattern of conduct evinced an actual intent to defraud. The debtor had been unable to meet his obligations for the prior year; and a consultant was managing his business, based upon an agreement with his creditors, by which they postponed collection efforts. Nonetheless, the debtor diverted business receipts into a secret account and used this money to obtain loans, which he used to pay off his homestead. He also sold his antique and other collections for less than their cost and was unable to account for approximately $20,000 in cash. *Id.* at 988–89.

■ The bankruptcy court's finding, affirmed by the district court, that Bowyer did not have an actual intent to defraud is not clearly erroneous.[5] For example, on the eve of bankruptcy, he did not borrow money that was then converted into exempt assets, *Reed,* 700 F.2d at 991, nor did the evidence reveal any extrinsic acts of fraud. *Smiley,* 864 F.2d at 567. His failure to list his liabilities or inform the Bank of changes in his financial condition do not necessarily render his subsequent acts fraudulent; a "finding of fraud requires more than a failure to volunteer information." *Smiley,* 864 F.2d at 568 (citing *Continental Bank & Trust Co. v. Winter,* 153 F.2d 397 (2d Cir.), *cert. denied,* 329 U.S. 717, 67 S.Ct. 49, 91 L.Ed. 622 (1946)).

### B.

■ As stated, while Bowyer's intent does not appear to reach the level of actual fraud, we do find intent to hinder or delay a creditor. *E.g., Smiley,* 864 F.2d at 568. The bankruptcy and district courts did not rule expressly on whether there was intent to hinder or delay. The bankruptcy court limited its holding, finding only that Bowyer's actions were not "the intent to *defraud* that the statute contemplates"; and the district court did not address this issue. (Emphasis added.)[6]

However, the term "defraud" does not subsume "hinder or delay." *E.g., see Smiley,* 864 F.2d at 568; *Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871, 878 (8th Cir.1988) (dissent). Pursuant to well established rules of statutory construction, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. U.S.,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *Bruce v. First Fed. Savings and Loan Ass'n,* 837 F.2d 712, 714 (5th Cir.1988). Furthermore, such rules require that we interpret a statute "to give effect, if possible, to every word Congress used." *Boureslan v. Aramco, Arabian American Oil Co.,* 892 F.2d 1271, 1275 (5th

---

**5.** The Bank contends also that the discharge must be denied because the bankruptcy court stated that "[o]n its face, all the elements of *Reed* appear satisfied." However, this statement must be considered in context: the bankruptcy court completed the statement by concluding that Bowyer's intent was "not an intent to defraud"; and that therefore, it would be inappropriate to deny his discharge.

**6.** The bankruptcy court may have included hinder or delay within that finding by implication. But, in any event, because this is a mixed question of law and fact, we reach it here, rather than remand for further findings.

Cir.1990) (dissent), *cert. granted,* —— U.S. ——, 111 S.Ct. 40, 112 L.Ed.2d 17 (1990) (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979)).

There is little legislative or judicial guidance on how to determine what actions fall within "intent" either to "hinder" or to "delay," especially concerning the conversion of non-exempt to exempt assets on the eve of bankruptcy. *E.g., see Smiley,* 864 F.2d at 566–67; *Norwest Bank,* 848 F.2d at 873–79; *Reed,* 700 F.2d at 990–91. Nevertheless, Bowyer's activities appear to be the very actions covered by either, or both, terms. One approach that appears appropriate in this instance is the "pig to hog" analysis: "when a pig becomes a hog it is slaughtered." *See, e.g., Norwest Bank,* 848 F.2d at 879 (quoting *In Re Zouhar,* 10 B.R. 154, 157 (Bktcy.D.N.M.1981)). This analysis recognizes that while some pre-bankruptcy planning is appropriate, the wholesale expenditure of non-exempt assets on the eve of bankruptcy, including conversion to exempt assets (especially where there are liberal state law exemptions), may not be.

Bowyer's actions can be argued to be allowable pre-bankruptcy planning; but this argument fails in light of his spending spree and the separate satisfaction of his homestead mortgage. For example, despite his avowed modest lifestyle, Bowyer spent the $18,000 from the gold sale on non-recoverable travel and exempt assets, during a period of time when he was both heavily indebted to the Bank and knew that he had financial troubles. But especially critical to finding extrinsic evidence of an intent to hinder or delay is that these funds were not deposited with a banking institution—certainly not his money market account with the Bank—rather, his wife carried the proceeds in her purse. As another example, in addition to other substantial homestead improvements in the summer of 1987, such as installing central air conditioning and heating, he added a greenhouse. And as a final example, he voluntarily satisfied his homestead mortgage 15 days before filing for bankruptcy, after discussing bankruptcy with two lawyers. His method of doing so, starting with the cashier's check payable to his wife, as described above, speaks volumes about Bowyer's intent to hinder or delay the Bank. In doing so, Bowyer took advantage of Texas' more than generous homestead law, which "provides an incentive for debtors such as ... [Bowyer] to keep their creditors in the dark about their conversion activities." *Smiley,* 864 F.2d at 568.

In sum, Bowyer's actions go beyond allowable pre-bankruptcy planning and are extrinsic evidence of an intent to hinder and delay a creditor, even though he may not have had an intent to defraud them. *Smiley,* 864 F.2d at 568; *In re Adeeb,* 787 F.2d 1339, 1343 (9th Cir.1986) (citing *In re Trinity Baptist Church, Inc.,* 25 B.R. 529, 532–33 (Bankr.M.D.Fla.1982)). Therefore, the district court erred in granting Bowyer a discharge under § 727.[7]

### III.

Finding that the district court erred in affirming the bankruptcy court's order allowing Bowyer's discharge, we

REVERSE and REMAND for proceedings consistent with this opinion.

---

7. Because we reverse on this issue, we need not reach the Bank's other contentions: that Bowyer (1) fraudulently or knowingly made false *oath or account,* under 11 U.S.C. § 727(a)(4); (2) did not satisfactorily explain the dissipation of assets, under 11 U.S.C. § 727(a)(5); *made a* false statement in writing, under 11 U.S.C. § 523(a)(2)(B); and obtained refinancing by actual fraud or misrepresentation, under 11 U.S.C. § 523(a)(2)(A).