In re Myron GOLOB, and Barbara Golob, Chapter 7 Debtors.

First Union National Bank, Plaintiff,

v.

Myron Golob, and Barbara Golob, Defendants.

Bankruptcy No. 97–36180–T.
Adversary No. 99–3032–T.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

March 23, 2000.

Michael D. Mueller, Augustus C. Epps, Christian & Barton, L.L.P., Richmond, VA, for First Union National Bank.

### *MEMORANDUM OPINION*

DOUGLAS O. TICE, Jr., Chief Judge.

Trial was held September 13, 1999, on First Union National Bank's complaint objecting to discharge based upon debtors'

alleged fraudulent transfer or concealment of assets, inadequate record keeping, false oaths or accounts, and specified acts in connection with other bankruptcy cases. At the conclusion of the trial the court took the ruling under advisement. For reasons stated in this memorandum opinion, the court will enter an order that denies the debtors the general discharge from their debts under 11 U.S.C. § 727.

## Parties

### DEFENDANTS.

Myron and Barbara Golob are the debtors in bankruptcy and defendants in this adversary proceeding. On September 5, 1997, when the debtors filed for chapter 11 bankruptcy, Mr. Golob and his wife were the sole shareholders and directors of three companies: Washington Suburban Financial Services, Inc., (WSFS) (a residential mortgage brokerage); Davis Ford Land Company, Inc., (DF) (a company whose sole asset was a parcel of unimproved real estate); and Farmville Amusement Center, Inc., (FAC) (a small amusement company). The debtors were lessees of an apartment in Alexandria, Virginia; owned a house on 61.3 acres of land in Farmville, Virginia, as their primary residence (the debtors purchased 64.3 acres in August 1, 1994, but purportedly conveyed 3.0 acres to Mrs. Golob's sister, V. Geraline Bailey, by deed dated November 10, 1995); owned a house on .81 acre of land in Farmville, Virginia (which was eventually sold with this court's approval) and owned a condominium in Florida.

Mr. Golob has been in the business of real estate financing and investing since 1958. He has been a loan officer for various companies and has worked as a loan officer and president of Washington Suburban Financial Services, Inc., since 1988.

Mrs. Golob was responsible for the day to day operations of Farmville Amusement Center, Inc., as well as caring for ailing family members. She has a 10th grade education.

See Appendix for a more complete history of related parties transactions and Exhibit A for time-line.

### PLAINTIFF.

First Union National Bank (First Union) is the plaintiff and the largest unsecured creditor of the debtors, having loaned funds to WSFS and FAC which were unconditionally guaranteed by the Golobs.

## Facts [1]

On April 11, 1995, the Golobs unconditionally guaranteed WSFS' promissory note to First Union in the original principal amount of $25,000.00. Three days later DF voluntarily filed a chapter 11 bankruptcy petition in the Alexandria Division, Eastern District of Virginia.

On May 10, 1995, First Union loaned FAC $500,000.00. The note was secured by a deed of trust on the debtors' Farmville real property but did not contain their personal guarantee.

On November 11, 1995, the Golobs conveyed to Mrs. Golob's sister, V. Geraline Bailey, three acres of their Farmville property that was adjacent to their house. (Ms. Bailey did not record this transfer until February 23, 1998.)

On February 2, 1996, First Union loaned FAC $125,000.00. The note was secured by a deed of trust on all equipment. The Golobs also signed an agreement that was an unconditional guarantee.[2]

---

1. This case has had a long and tortuous history. The court has tried to limit the facts here to what is relevant, but the complicated financial affairs of the debtors necessitate some discussion of their wholly owned companies. Additional factual details regarding the Golobs' financial interests and transactions are contained in Appendices A and B attached to this opinion.

2. Much of the ill will between the parties apparently stems from a disagree over the scope of this unconditional guarantee. The Golobs assert that when they signed the agreement, they thought it only covered the $125,000.00 note. First Union claims that this agreement personally guaranteed all lia-

On March 7, 1997, Mrs. Golob filed a chapter 13 bankruptcy petition in the Alexandria Division, Eastern District of Virginia. On April 7, 1997, Mrs. Golob opened a checking account at Benchmark Community Bank. The existence of this account was never voluntarily disclosed on the schedules of that bankruptcy or subsequent bankruptcies. On June 4, 1997, Mrs. Golob's chapter 13 petition was voluntarily dismissed.

On April 22, 1997, FAC filed pro se its first chapter 11 bankruptcy petition in this court, which was dismissed on May 5, 1998, because the filing was not complete. FAC filed a second chapter 11 bankruptcy petition in this court on May 28, 1997.

On August 7, 1997, less than one month before the Golobs filed their own bankruptcy case, they opened a checking account at NationsBank. The checks for this account were imprinted with the address of the Golobs' condo in Florida, but the statements were mailed to the debtors in Virginia. The existence of this account was also never voluntarily disclosed in the debtors' subsequent bankruptcy.

On September 5, 1997, the Golobs jointly filed pro se a chapter 11 bankruptcy petition. On September 18, 1997, while both DF and the Golobs were in their respective chapter 11 bankruptcies, Mr. Golob, on the advice of an attorney but without authority from either bankruptcy court, caused DF to convey its real property to himself and his wife as tenants by the entireties; they recorded the deed the next day. This transfer occurred just prior to a foreclosure sale that Bank Midwest scheduled for September 22, 1997.[3] Subsequently, Bank Midwest had to obtain relief from stay in the Golobs' personal bankruptcy case so that it could file an adversary proceeding in the DF's bank-

ruptcy case to determine property rights and pursue its rights to foreclose on the property. Mr. Golob signed a consent order which allowed the transfer of the property back to DF and gave him a limited number of days to pay off the entire Bank Midwest note. Three days after he signed the order, the company that had agreed to refinance the property reneged, so Bank Midwest foreclosed on the property.

On October 16, 1997, the court granted FAC's trustee's motion to convert the FAC bankruptcy case from a chapter 11 reorganization to a chapter 7 liquidation, and the company ceased business operations. First Union was granted relief from stay and in February 1998 sold FAC's assets at a foreclosure auction for a fraction of their value. FAC's trustee in bankruptcy filed a report of no distribution, and on March 3, 1998, that case was closed.

On November 18, 1997, the Golobs, while they were in bankruptcy, granted a deed of trust in their residence to F & M Bank to secure the renewal of a pre-petition promissory note between F & M Bank and WSFS. This conveyance was not authorized by the court.

On October 10, 1998, the court granted First Union's motion to convert the Golobs' case from a chapter 11 to a chapter 7.

On March 15, 1999, First Union timely filed a complaint to deny Mr. and Mrs. Golob a general discharge under § 727. Subsequently, the trustee in bankruptcy intervened as a party/plaintiff. At trial on September 13, 1999, both First Union and the trustee argued that the debtors' discharge should be denied under various sections of 11 U.S.C. § 727.

Additional findings of fact are stated in Appendices A and B and in the court's conclusions of law.

bilities to First Union, including the $500,000.00 note.

**3.** On April 29, 1996, DF's reorganization plan was confirmed. Part of that plan required the Golobs to lease the property from DF but did not alter or change in any way the obli-

gation of DF on Bank Midwest's note or the deed of trust securing that note. The Golobs defaulted several times on the lease and stopped making lease payments during the Summer of 1996. On September 19, 1996, Bank Midwest filed an affidavit of breach.

*First Union's Complaint*

First Union's complaint categorizes numerous allegations into four counts depending on which provision of § 727 is allegedly violated.

Count I asserts that the debtors should be denied a discharge under § 727(a)(2).[4] Specifically, the complaint alleges that the debtors improperly and continuously used two bank accounts (NationsBank account number 411–156–2857 and Benchmark Community Bank account number 300519626) during and throughout their bankruptcy case and failed to disclose the existence of these accounts on the bankruptcy schedules, statements of financial affairs, and monthly operating reports. First Union also alleges that a deed of trust on the debtors' personal residence dated November 18, 1997, (securing a promissory note from WSFS to F & M Bank dated July 17, 1997, in the original principal amount of $250,000.00) was a transfer of an interest in real property during bankruptcy without court approval.

Count II asserts that the debtors should be denied a discharge under § 727(a)(3).[5] Specifically, the complaint alleges that the debtors failed to keep or preserve records regarding their banking relationships,

their compensation or income, loans made to them, and debts owed by them.

Count III asserts that the debtors should be denied a discharge under § 727(a)(4)(A).[6] Specifically, the complaint alleges that the debtors made false oaths in their schedules and statement of financial affairs (e.g., ownership of assets, transfers of approximately $20,000.00 to their creditors within 90 days prior to filing bankruptcy, and numerous transfers to insiders within one year prior to filing bankruptcy) and made false oaths during their § 341 hearings.

Count IV asserts that the debtors should be denied a discharge under § 727(a)(7).[7] Specifically, the complaint alleges that in connection with DF's bankruptcy case, the Golobs transferred property of that bankruptcy estate with the intent to hinder, delay or defraud creditors. The complaint also alleges that in connection with FAC's bankruptcy case, the Golobs used a checking account at Benchmark Community Bank which was not disclosed on the schedules, statement of financial affairs, or monthly operating reports, despite FAC having been ordered to conduct its banking transactions solely through a debtor-in-possession account. Finally, the complaint alleges that in con-

4. Section 727(a)(2) states that the court shall grant the debtor a discharge unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
(A) property of the debtor, within one year before the date of the filing of the petition; or
(B) property of the estate, after the date of the filing of the petition;
11 U.S.C. § 727(a)(2).

5. Section 727(a)(3) states that the court shall grant the debtor a discharge unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition

or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
11 U.S.C. § 727(a)(3).

6. Section 727(a)(4) states that the court shall grant the debtor a discharge unless—

(4) the debtor knowingly and fraudulently, in or in connection with the case—
(A) made a false oath or account; . . .
11 U.S.C. § 727(a)(4).

7. Section 727(a)(7) states that the court shall grant the debtor a discharge unless—

(7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider;
11 U.S.C. § 727(a)(2).

nection with FAC's bankruptcy case, the Golobs made numerous false oaths in the schedules and statement of financial affairs, including undisclosed transfers of approximately $70,000.00 to insiders within one year prior to filing bankruptcy.

### Conclusions of Law

The issue before the court is whether the Golobs should be denied a general discharge under § 727.

 Section 727 of the Bankruptcy Code allows debtors to receive a general discharge of their obligations in keeping with the primary purpose of bankruptcy law, to give honest debtors a fresh start "unhampered by the pressure and discouragement of preexisting debt." *See Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir.1994) (quoting *Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970)). However, provisions enumerated in §§ 727(a)(1)–(10) prohibit a discharge for those who "play fast and loose with their assets or with the reality of their affairs." *See id.* (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987)).

A leading treatise on bankruptcy law has stated:

> The provisions denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. Courts have noted that "a total bar to discharge is an extreme penalty." The reasons for denial of a discharge must be real and substantial rather than technical and conjectural. However, "[w]hile the law favors discharges in bankruptcy, it will not ordinarily tolerate the [debtor's] intentional departure from honest business practices where there is a reasonable likelihood of prejudice."

*See* 6 *COLLIER ON BANKRUPTCY* ¶ 727.01[4] (Lawrence P. King ed., 15th ed. rev.1999) (citations omitted).

 First Union has objected to the Golobs' discharge under four provisions:

§§ 727(a)(2), (a)(3), (a)(4)(A), and (a)(7). The bank has the burden of proving its objection to the discharge. *See FED. R. BANKR. P.* 4005; *Farouki*, 14 F.3d at 249. Although the burden may shift to the debtor to provide satisfactory, explanatory evidence once the creditor has established a *prima facie* case, the ultimate burden rests with the creditor. *See Farouki*, 14 F.3d at 249. The standard of proof in a discharge action is the preponderance of the evidence. *See id.*

 A party objecting to a discharge need only prove one of the grounds for non-dischargeability under § 727(a) because these provisions are phrased in the disjunctive. *See id.* at 250. Proof of any one of the sub-sections is enough to justify a denial of a debtors' discharge. *See id.* Hence, of the four counts contained in the bank's complaint to deny discharge, denial of discharge for any one count will eliminate the need for consideration of the other three. *See id.* The court finds it necessary to consider just two of the grounds alleged.

### A. DENIAL PURSUANT TO § 727(a)(3).

First Union argues that the debtors' discharge should be denied pursuant to § 727(a)(3) because they concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtors' financial condition or business transactions might be ascertained. Specifically, First Union alleges the debtors concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information regarding, among other things, the following:

a. bank records, including but not limited to, bank statements and canceled checks pertaining to personal and business accounts;

b. documents pertaining to or evidencing compensation paid, or loans to

Mr. Golob from Washington Suburban Financial Services, Inc.;

c. documents pertaining to or evidencing an alleged indebtedness owed to V. Geraline Bailey;

d. documents pertaining to or evidencing the debtor(s) [sic] interest in Advanced Integrated Marketing Systems, Inc.;

e. documents pertaining to or evidencing funds owed to the [d]ebtors and/or Davis Ford [Land, Inc.] by Mr. Benjamin Adewale;

f. documents pertaining to or evidencing the [d]ebtor's indebtedness and/or lease agreement with General Motors Acceptance Corporation;

g. documents pertaining to an indebtedness of Washington Financial Services, Inc. to F & M Bank, including but not limited to, the F & M Deed of Trust, and certain Commercial Guaranty agreements; and

h. documents pertaining to or evidencing an indebtedness owed to, or lawsuit filed by, F & M Bank.

*Comp.* ¶ 24.

■■■ Section 727(a)(3) states that the court shall grant the debtor a discharge unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

11 U.S.C. § 727(a)(3).

Although it has been stated that in issues raised on objections to discharge, the law should be resolved in favor of the debtor, this generalization should be qualified by noting that the interests protected by section 727 "are those of creditors and that the [debtor] is required to take such steps as ordinary

fair dealing and common caution dictate to enable the creditors to learn what he did with his estate." If the facts disclose an apparent breach of the debtor's duty to creditors to keep or preserve proper books or records and the debtor fails to establish facts and circumstances to justify the lack of records, a discharge should be denied.

*See* 6 *COLLIER ON BANKRUPTCY* ¶ 727.03[1] (citations omitted).

The debtor's obligation to present records of financial information is intended to protect the trustee and creditors by enabling them to determine or confirm the debtor's financial condition and the cause of the debtor's financial difficulty. The records need not be in any particular form; however, they must be sufficient to "enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past."

*See id.* ¶ 727.03[3][a] (citations omitted).

■■■ All books and records that are material to proper understanding of the debtor's financial condition are within the scope of this provision, including books of the debtor's corporate entities that are necessary to proper understanding of the debtor's financial condition and business transactions. *See id.* ¶ 727.03[3][e] (citations omitted). Moreover,

a debtor who is a sophisticated business person will be held to a higher level of accountability in record keeping. If the nature and extent of the debtor's transactions were such that others in like circumstances would ordinarily keep financial records, the debtor must show that because of unusual circumstances there was no duty to keep them.

*See id.* ¶ 727.03[3][b] (citations omitted).

■■■ To sustain an objection to a discharge under § 727(a)(3) the proof should show (1) either a failure by the debtor to keep or preserve any recorded information, or an act of destruction, mutilation,

falsification, or concealment of any recorded information; and (2) that by failure to keep such records or the act complained of it is impossible to ascertain the financial condition and material business transactions of the debtors. *See id.* ¶ 727.03[4].

■ First Union has been relentless. It has scrutinized the Golobs' financial affairs throughout FAC's bankruptcy and the debtors' personal bankruptcy. Counsel for First Union has extensively questioned the Golobs and amassed voluminous amounts of material in an effort to ascertain the debtors' financial condition and business transactions. The evidence presented by First Union at trial is overwhelming.

### 1. *Failure to Keep or Preserve Records.*

The Golobs are sophisticated business people with complicated financial affairs. At one point they owned at least three closely held businesses, one of which is a mortgage brokerage business. The debtors had a duty to maintain reasonably accurate records of their financial transactions.

The Golobs carried out large transactions that cumulatively involved hundreds of thousands of dollars that have virtually no paper trail. *See, e.g., Comp.* ¶ 24(a)–(e) (quoted above). There were also several instances where paperwork apparently existed at one time but the debtors assert they cannot produce it. *See, e.g., id.* ¶ 24(f)–(h) (quoted above). The nature and extent of these transactions were such that others in like circumstances would ordinarily have kept financial records, so the debtors must show what the unusual circumstances were that there was no duty to keep them.

The debtors have failed to explain why they had no duty to preserve their records. For example, in 1996 the debtors' house was broken into and ransacked.[8] The debtors have stated that although the

perpetrator did not steal any records, their records were left in a chaotic mess and that rather than sort out the records and bank statements, the debtors threw them out. The debtors explain they did not have a problem in 1996 and were not concerned that they necessarily needed the records for preparing tax returns or anything of that nature. *See Test, of Myron Golob at § 341 Meeting on Nov. 18, 1998, in Case No. 97–36180–S,* Ex. 112 at 122. However, it does not appear at that time that the debtors had filed tax returns for 1995 (or 1994). Even if the court accepted this explanation for documents before 1996, it does not explain their failure to preserve documents after 1996.

### 2. *Impossible to Ascertain the Financial Condition and Material Business Transactions.*

From the records that have been produced, it has been impossible for the debtors to untangle their affairs in a way that creditors can ascertain their financial condition and material business transactions. For example, during the debtors' § 341 meeting when discussing the 1994 through 1997 tax returns and supporting documents, Mr. Golob admitted that

> trying to reconstruct is really kind of difficult. At the time in 1994, '95, '96, I was running two or three businesses [a]nd it's kind of difficult [b]ecause it's all blended together. And the fact we didn't file, that's fine, I didn't file. But I did file and a lot of stuff was estimated and that was acceptable to the IRS. And that's what I did. So, the files and records for those years, '95, '96, and even '94, I don't even know where it is, to tell you the truth. But I know we filed it because we filed the business's. And that's a problem. It is a problem. It's a problem for me.

*Id.* at 20.

Based upon the evidence, the court concludes that the debtors have without justi-

---

8. The person who did this was caught and served jail time.

fication, concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information, including books, documents, records, and papers, from which their financial condition or business transactions might be ascertained. Accordingly, the debtors' general discharge must be denied under § 727(a)(3).

## B. DENIAL PURSUANT TO § 727(a)(7).

First Union argues that the debtors' discharge should be denied pursuant to § 727(a)(7) because they transferred land as insiders in DF's bankruptcy case in violation of § 727(a)(2)(B). Specifically, on September 18, 1997, while both DF and the Golobs were debtors in chapter 11 cases, Mr. Golob conveyed the property from DF to himself and his wife as tenants by the entireties just prior to a scheduled foreclosure.

The court's analysis starts with the allegation that actions occurred which violated § 727(a)(2)(B) in the DF's bankruptcy, then proceeds with the allegation that those actions also violated § 727(a)(7) in the Golobs' personal bankruptcy.

### 1. *Davis Ford Land, Inc.'s Bankruptcy.*

Section 727(a)(2) states that the court shall grant the debtor a discharge unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

11 U.S.C. § 727(a)(2).

■ In order to deny discharge under § 727(a)(2), the statute requires that four elements be proven: (1) a transfer of property; (2) belonging to the debtor; (3) after the date of the filing of the petition; (4) with intent to hinder, delay, or defraud a creditor or officer of the estate. At issue in this case is whether there was a transfer, and whether it was done with intent to hinder, delay, or defraud a creditor or officer of the estate.

■ "Transfer" is broadly defined in § 101 of the Bankruptcy Code as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest . . . ." 11 U.S.C. § 101(54). "Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control, even if there is no transfer of title, because possession, custody, and control are interests in property." 6 *COLLIER ON BANKRUPTCY* ¶ 727.02[5]. Therefore, there was an actual transfer of valuable property belonging to the debtor which reduced the assets available to the sole creditor.

Furthermore, the transfer was made with the intent to hinder or delay a creditor of the estate. As the following exchange in the § 341 meeting indicates, Mr. Golob admits that the "ultimate goal" of the transfer was to frustrate the foreclosure that the bank had scheduled. *See Test. of Myron Golob at § 341 Meeting on Dec. 23, 1997, in Case No. 97–36180–S,* Ex. 111 at 45–46.

John Markovs (Counsel for Bank Midwest): For the purposes of this first meeting of creditors you would agree with me that that property is not an asset of your estate?

Myron Golob: The property at this time, it is as asset of my estate.

Markovs: Can you tell me why you believe that?

Golob: Because the corporation was dissolved and the stockholders, my wife and myself, took the deed from Davis

Ford Land, Inc., to us as our personal estate.

Markovs: Didn't you take it as trustees in dissolution for the benefit of the creditors of Davis Ford Land, Inc[.]?

Golob: No.

Markovs: So it's you position today that it's your property?

Golob: Yes, sir.

Markovs: And you would admit that the September 18, 1997 deed conveying the property was executed by you on behalf of Davis Ford for the sole purpose of stopping the September 22nd, 1997 foreclosure sale?

Golob: No. It was done to dissolve the corporation to put into my estate whether it was—that was the purpose of the—

Markovs: But the charter forfeited over a year prior, right? But you didn't see fit to transfer the property in September of 1996; you waited until four days prior to the foreclosure sale scheduled by Bank Midwest to transfer the property?

Golob: The purpose of the filing and the transfer was not to deceive nor to withhold an asset from Bank Midwest. It was done at the time it was made known to me that this was what—the circumstances, that there was no charter.

Markovs: I don't understand your response.

Gregg Nivala (Assistant U.S. Trustee): That's just not believable.

Golob: What?

Nivala: Well, when you transfer property four days or two days or however many days ahead of a foreclosure when the corporation has been dissolved for a year or six months or whatever, it's just not believable that you testify that you didn't do it to frustrate the foreclosure.

Golob: That was not—there was no knowledge of the charter. We didn't know—I didn't know about the charter until that time.

Nivala: So it's your testimony that you didn't transfer this property on behalf of Davis Ford Land, Inc., to you and Mrs. Golob in order to frustrate the foreclosure that was scheduled four days later or two days later or whatever it is?

Golob: I don't know if—I don't know if—if it would have made any difference, and I pose this question. I don't know.

Nivala: Why don't you just answer the question? Did you transfer the property on behalf of Davis Ford Land, Inc., to you and your wife in order to frustrate the foreclosure that this bank had scheduled?

Golob: I suppose that was the ultimate goal, but as the—only as part of my estate—the stock was part of my estate. It wouldn't have made any difference under these circumstances. That's my question.

Nivala: Well, I'm not here to answer questions; you're here to answer questions.

Golob: I being [sic] your pardon.

Markovs: You received Bank Midwest's motion for relief from automatic [stay]?

Golob: Yes.

. . .

Markovs: So your position today is that when the corporation dissolved and you executed a deed in your favor to in essence frustrate the foreclosure sale scheduled by Bank Midwest, you're taking the position that the property is now yours and not held in trust for the benefit of Bank Midwest?

Golob: Yes.

*Id.* at 43–47.

 A careful reading of § 727(a)(2) indicates that intent to hinder or delay creditors, even if not fraudulent, may be sufficient for a denial of discharge. *See* 6 *COLLIER ON BANKRUPTCY* ¶ 727.02[3][a] (citing *NCNB Texas Nat'l Bank v. Bowyer (In re Bowyer)*, 916 F.2d 1056 (5th Cir.1990); *Federal Deposit Ins.*

*Corp. v. Morris (In re Morris)*, 51 B.R. 462 (Bankr.E.D.Tenn.1985) (noting that language is disjunctive)).

■ The court finds that the Golobs' actions in connection with DF"s bankruptcy case violated § 727(a)(2)(B) because they transferred property belonging to DF"s bankruptcy case with intent to hinder or delay a creditor of the estate.

Our holding is similar to the Fourth Circuit's decision in *Ford v. Poston (In re Ford)*, 773 F.2d 52 (4th Cir.1985), where the debtor's discharge was denied under § 727(a)(2)(A) because the debtor transferred an interest in real property to himself and his wife as tenants by the entireties the day after judgment was entered against the debtor. The only distinction between that case and this case, which is a distinction without a difference, is that the Golobs transferred the real property in DF"s bankruptcy case after the petition date instead of before it, and as such, their conduct falls under § 727(a)(2)(B) rather than § 727(a)(2)(A).

### 2. *Myron & Barbara Golob's Personal Bankruptcy.*

Section 727(a)(7) states that the court shall grant the debtor a discharge unless—

> (7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, *in connection with another case,* under this title or under the Bankruptcy Act, concerning an insider;

11 U.S.C. § 727(a)(7) (emphasis supplied).

■ The Golobs' actions in connection with DF"s bankruptcy case also violated § 727(a)(7) in their personal case because they committed the act during their case as insiders of DF. The fact that the transfer ultimately was reversed is irrelevant. *See Riggs Nat'l Bank v. Andrews (In re Andrews),* 186 B.R. 219, 223 (Bankr. E.D.Va.1995) ("[T]hat the transfer was subsequently reversed is irrelevant....

Furthermore, debtor did not attempt to reverse the transaction until after this adversary proceeding was commenced and after the trustee had filed an adversary proceeding to avoid the transfer.").

Accordingly, the debtors' general discharge must also be denied under § 727(a)(7).

In summary, a party objecting to a discharge need only prove one of the grounds for non-dischargeability under 11 U.S.C. § 727(a) because these provisions are phrased in the disjunctive. First Union National Bank has plainly met its burden of proof by a preponderance of the evidence on two separate grounds. The court will therefore not address the remaining grounds alleged in First Union's complaint

A separate order will be entered denying the debtors' discharge pursuant to 11 U.S.C. §§ 727(a)(3) and (7).

### *APPENDIX A—RELATED PARTIES*

#### *Washington Suburban Financial Services, Inc.*

Washington Suburban Financial Services, Inc., (WSFS) is a residential mortgage loan brokerage. The company was incorporated in Virginia on June 30, 1987. Mr. and Mrs. Golob are the officers, directors, and hold 100% of the stock of WSFS as tenants by the entireties. At any given time, WSFS employs Mr. Golob and one other person. The only accounting record for WSFS is a manually recorded checkbook register.

WSFS makes its money from discount points, loan origination fees and other fees. Typically, it processes a mortgage loan application to a conclusion, places the loan with a bank and closes the deal. WSFS does not actually fund the loan, nor does it service the loan.

First Union National Bank had loaned WSFS $25,000.00 pursuant to a promissory note dated April 11, 1995, which the Golobs unconditionally guaranteed by agreement dated April 11, 1995.

### Davis Ford Land, Inc.

Davis Ford Land, Inc., (DF) was incorporated in Virginia on March 9, 1994, for the express purpose of acquiring real property with non-recourse financing. Mr. and Mrs. Golob were the sole shareholders of record and directors of DF. However, at some point Benjamin Adewale invested $25,000.00 to become a stockholder. Mr. Golob testified that the money was invested on a handshake, and no formal documents are available to evidence this transaction. The company had no employees and did not even have a checking account until it was required to open one in bankruptcy.

The only asset in DF was 9.72 acres of unimproved land on Prince William Parkway, Prince William, Virginia. (The land is located approximately ten miles from where Walt Disney was looking at developing a theme park.) Bank Midwest had loaned DF $484,500.00 pursuant to a non-recourse promissory note that was secured by the land.

On April 14, 1995, DF voluntarily filed a chapter 11 bankruptcy petition in the Alexandria Division, Eastern District of Virginia. On April 29, 1996, a plan of reorganization was confirmed. Part of the reorganization plan was for DF to lease the property to the Golobs, who would then use it to develop a golf driving range. The plan of reorganization did not alter or change in any way the obligation of DF on Bank Midwest's note or the deed of trust securing that note. The Golobs defaulted several times on the lease and stopped making lease payments during the Summer of 1996. On September 19, 1996, Bank Midwest filed an affidavit of breach.

On September 18, 1997, while both DF and the Golobs were in chapter 11 bankruptcies, Mr. Golob, on the advice of his attorney but without authority from either bankruptcy court, conveyed the property from DF to himself and his wife as tenants by the entireties. This took place just prior to a foreclosure sale that had been scheduled by Bank Midwest for September 22, 1997. Mr. Golob claims to have been confused about who had title to the property once DF's corporate status was terminated [9] but he admits that the "ultimate goal" of the transfer was to frustrate the foreclosure that the bank had scheduled and to preserve the equity in the property. Midwest then had to move for relief from stay in the Golobs' personal bankruptcy case so that it could file an adversary proceeding in DF's bankruptcy case to determine property rights and pursue its rights to foreclose on the property. Mr. Golob signed a consent order which authorized the transfer of the property back to DF and gave him a limited number of days to pay off the entire Bank Midwest note. Three days after he signed the order, the company that had agreed to refinance the property reneged, so the property was foreclosed. At the time, Mr. Golob estimated the land was worth $2,200,000.00. (In 1992 the property had been appraised at $1,700,000.00.) The land was sold at foreclosure to an unknown third party for around $639,000.00. The purchaser paid $.50 over the amount Bank Midwest bid to cover the principal plus accrued interest and fees.

### Farmville Amusement Center, Inc.

Farmville Amusement Center, Inc., (FAC) was incorporated in Virginia on April 3, 1991. Mr. and Mrs. Golob were the sole shareholders, officers, and directors of FAC. Mrs. Golob was responsible for the day to day operations, working 12 to 13 hours per day. On Fridays, Mr. Golob would drive down from his job in northern Virginia so that he could help during the weekends. Mrs. Golob's sister,

9. On September 1, 1996, DF's corporate charter was terminated for its failure to file an annual report and pay annual fees, and the property passed to its directors as trustees in liquidation.

V. Geraline Bailey, worked 10 to 15 hours per week. The company also employed up to 9 part-time persons during the busy season. The company was operated on a cash basis. Besides the checking account records and the tax returns, there are no other books and records for FAC.

FAC's amusement center had arcade equipment, batting cages, miniature golf, go carts, et cetera. It was a highly seasonal business, with June, July and August accounting for up to 50% of annual revenues. The company was initially profitable, but struggled in later years. The Golobs attributed this to bad weather and lack of community acceptance. They tried expanding the business to broaden its appeal. The company spent considerable sums to build a golf driving range but was sued and forced to shut this operation down. The company also spent large sums to buy bumper boats and build a bumper pool for these boats but ran out of capital.

First Union had loaned FAC $500,000.00 pursuant to a promissory note dated May 10, 1995. That note was secured by a deed of trust on the debtors' Farmville real property and was not personally guaranteed by the Golobs. In addition, First Union loaned FAC $125,000.00 pursuant to a promissory note dated February 2, 1996. This note was secured by a deed of trust on all of the equipment. The Golobs also signed an unconditional personal guarantee agreement dated February 2, 1996. At the time, the Golobs have stated that they thought that they were guaranteeing just the $125,000.00. However, First Union claims that this agreement personally guarantees all liabilities to First Union. The Golobs dispute the propriety of this claim.

On April 7, 1997, FAC filed pro se its first chapter 11 bankruptcy petition in this court. On May 5, 1998, the case was dismissed because the debtor did not complete the filing.

On May 28, 1997, FAC filed its second chapter 11 bankruptcy petition in this court. (The debtor also filed this petition pro se, but was advised by the law firm Towarnicky & Vincent at various points during the bankruptcy.) During the course of the bankruptcy, the Golobs provided First Union with boxes of records related to FAC, WSFS, and personal finances. (These records were eventually returned to the Golobs.)

On October 16, 1997, the court entered a order granting the trustee's motion to convert the case from a chapter 11 reorganization to a chapter 7 liquidation, and the company ceased business operations. In February 1998, FAC's assets were sold at auction for a fraction of their value. The trustee filed a report of no distribution and the case was closed.

### V. Geraline Bailey

Ms. V. Geraline Bailey, Barbara Golob's sister, loaned the Golobs approximately $25,000.00 that she obtained by refinancing her house. Additionally, she loaned the Golobs approximately $25,000.00 when she sold a house in Maryland. The Golobs in turn helped her when she was building a house. The Golobs conveyed to Ms. Bailey, by deed dated November 11, 1995, three acres of unimproved land in Farmville that was adjacent to their house. The deed was delivered to Ms. Bailey in 1995, but she did not record it deed until February 23, 1998, when she wanted to refinance the property. Ms. Bailey refinanced her home and gave the money to the Golobs so that they could purchase their house from the bankruptcy estate.

At the time the Golobs filed bankruptcy, they owed Ms. Bailey approximately $40,-000.00. The Golobs concede that because the loan was among family members, they have not kept the records as maybe they should have.

## APPENDIX B—TIMELINE

| Date | | Washington Suburban Financial Services Inc. | Davis Ford Land Inc. | Farmville Amusements Center Inc. | Myron & Barbara Golob | V. Geraline *Bailey* (Mrs. Golobs' sister) |
|---|---|---|---|---|---|---|
| 04/11/95 | First Union Bank loans $25,000 to WSFS | 1st Union loans 25K | | | | |
| 04/11/95 | First Union claims Golobs unconditionally guarantee WSFS loan | personal guarantee | | | personal guarantee | |
| 04/14/95 | Davis Ford Land, Inc. files chapter 11 petition | | file vol. c 11 | | | |
| 05/10/95 | First Union loans $500,000 to Farmville Amusement Ctr, Inc. | | | 1st Union loans 500K | | |
| 11/10/95 | Golobs transfer real estate to V. Geraline Bailey (Mrs. Golobs' sister) | | | | land to Ms. Bailey | land from Golobs |
| 02/02/96 | First Union loans $125,000 to Farmville Amusement Ctr, Inc. | | | 1st Union loans 125K | | |
| 02/02/96 | First Union claims Golobs unconditionally guarantee FAC loan(s) | | | personal guarantee | personal guarantee | |
| 09/01/96 | Davis Ford Land, Inc. forfeits charter | | forfeit charter | | | |
| 03/07/97 | Mrs. Golob files chapter 13 petition in Alexandria, Virginia | | | | file c. 13 | |
| 04/07/97 | Mrs. Golob opens Benchmark Comm. Bank a/c—never disclosed on schedules | | | | open undisclosed a/c | |
| 04/22/97 | Farmville Amusement Ctr, Inc. files chapter 11 petition | | | file vol. c. 11 | | |
| 05/06/97 | Farmville Amusement Ctr, Inc chapter 11 dismissed | | | c.11 dismissed | | |
| 05/28/97 | Farmville Amusement Ctr, Inc. files 2d chapter 11 petition | | | file 2d vol. c. 11 | | |
| 06/04/97 | Mrs. Golob's chapter 13 petition was voluntarily dismissed | | | | c.13 dismissed | |
| 06/09/97 | Farmville Amusement Ctr, Inc. files schedules & Stmt of Fin Affairs | | | file sch & stmt | | |
| 07/17/97 | F & M Bank loans $250,000 to WSFS | F & M loans 250K | | | | |
| 08/07/97 | Golobs open NationsBank a/c using Florida address never disclosed on schedules | | | | open undisclosed a/c | |
| 09/05/97 | Golobs file chapter 11 petition | | | | file vol c. 11 | |
| 09/15/97 | Golobs file schedules & Stmt of Financial Affairs | | | | file sch & stmt | |
| 09/18/97 | Davis Ford Land, Inc. transfers real estate to Golobs | | land to Golobs | | land from Davis Ford | |
| 09/19/97 | Golobs record deed on land received from Davis Ford Land. Inc. | | | | deed recorded | |
| 09/25/97 | First Union files unsecured claim related to personal guarantee | | | | 1st Union files claim | |
| 10/16/97 | Trustee has Farmville Amusement Ctr, Inc. chapter 11 converted to chapter 7 | | | c 11 converted to c. 7 | | |
| 11/18/97 | F & M Bank receives a Deed of Trust on residence | F & M records | | | F & M get Deed of Trust | |
| 12/18/97 | Golobs file amended schedules A,B & D | | | | amend sch | |
| 02/23/98 | V. Geraline Bailey records 11/10/95 deed transferring property from Golobs | | | | | deed recorded |
| 03/03/98 | Farmville Amusement Ctr closed by Order | | | c.7 closed | | |
| 05/11/98 | First Union amends unsecured claim after liquidating collateral | | | | 1st Union amends claim | |
| 10/07/98 | First Union has Golobs chapter 11 converted to chapter 7 | | | | c.11 converted to c. 7 | |
| 11/17/98 | Change in Trustee: Buis resigns, Shaia appointed | | | | trustee change | |
| 12/20/98 | Golobs file amended schedules A B.C.D.F & G and Stmt of Fin Aff | | | | amend sch & stmt | |
| 03/15/99 | First Union files Complaint objecting to section 727 discharge | | | | objection to discharge | |
| 06/11/99 | Trustee permitted to intervene as plaintiff in Complaint objecting to discharge | | | | trustee intervenes | |