**In re James G. WYNN, Lee'Sha F. Wynn, Debtors.**

**Colonial Bank, et al., Plaintiffs,**

**v.**

**James G Wynn and Lee'Sha F. Wynn, Defendants.**

**Bankruptcy No. 99–5171–WRS.
Adversary No. 00–10–WRS.**

United States Bankruptcy Court, M.D. Alabama.

April 19, 2001.

288

Richard A. Lawrence, Montgomery, for Debtors.

Charles N. Parnell, III, Montgomery, for Colonial Bank.

Von G. Memory, Montgomery, for Aliant Bank.

John I. Cottle, III, Tallassee, for O.C. Harden.

Thomas McGregor, Montgomery, for trustee.

## *MEMORANDUM DECISION*

WILLIAM R. SAWYER, Chief Judge.

### *I. INTRODUCTION*

In this Adversary Proceeding, the Court is called upon to determine whether the Debtor has failed to keep sufficient recorded information and documents from which his financial condition and business transactions might be ascertained. The Trustee in bankruptcy and three creditors contend that he did not and that his discharge should be denied pursuant to 11 U.S.C. § 727(a)(3). Trial of the Adversary Proceeding concluded on December 15, 2000. At the Court's request, all parties filed proposed findings of fact and conclusions of law after the conclusion of the trial. For the reasons set forth below, the Court enters judgment in favor of the Plaintiffs and denies the Defendant James G. Wynn a discharge.

This consolidated adversary proceeding consists of five separate adversary proceedings which were consolidated by this Court's order of July 10, 2000. (A.P.00–10, Doc. 13). Those Adversary Proceedings are as follows: (1) *Colonial Bank v. James G. Wynn*, Adv. Pro. No. 00–10; (2) *O.C. Harden, Jr. v. James G. Wynn*, Adv. Pro. No. 00–31; (3) *Aliant Bank v. James G. Wynn*, Adv. Pro. No. 00–53; (4) *Union Planters Bank v. James G. Wynn and Lee'Sha F. Wynn*, Adv. Pro. No. 00–54; (5) *Tom McGregor, Trustee v. James G. Wynn and Lee'Sha F. Wynn*, Adv. Pro. No. 00–99.

Defendant James Wynn moved to dismiss Adversary Proceeding No. 00–54 (Number 4 above), which was brought by Union Planters Bank, on the grounds that it was time barred. Following this Court's denial of that motion, Wynn prosecuted an interlocutory appeal to the District Court. The District Court stayed proceedings in Adversary Proceeding No. 00–54 by its order of October 19, 2000.[1] Accordingly, Adversary Proceeding No. 00–54 was not tried with the other four adversary proceedings.

---

**1.** *Union Planters Bank v. James G. Wynn, et al. (In re Wynn)*, Civil No. 00–T–1204–N, in the United States District Court for the Middle District of Alabama. (Appeal pending).

Of the four remaining consolidated Adversary Proceedings which were tried, only the Adversary Proceeding brought by the Trustee named Lee'Sha F. Wynn as a party defendant. At the close of the Plaintiffs' cases in chief, Lee'Sha F. Wynn moved to dismiss the claim against her, in Adversary Proceeding No. 00–99, on the grounds that the evidence was not sufficient. No opposition was raised to her motion and the Court granted it. As there is no bar to a discharge in favor of Lee'Sha F. Wynn, the Court will grant her a discharge pursuant to 11 U.S.C. § 727.

A summary of the claims in the four remaining adversary proceedings is as follows:

(1) Adv. Pro. No. 00–10 [Colonial Bank], Count I—Section 727(a)(3) [failure to keep records]; Count II—Section 523(a)(2)(A) [fraud with respect to Colonial Bank loans]; Count III—Section 523(a)(2)(B) [obtaining loan by false financial statement]; Count IV—Section 523(a)(4) [fraud in a fiduciary capacity].

(2) Adv. Pro. No. 00–31 [O.C. Harden, Jr.], Section 523(a)(2)(A) [fraud with respect to extension of credit to purchase building materials]; Section 727(a)(3), (4) and (5).

(3) Adv. Pro. No. 00–53 [Aliant Bank], Count I—Section 523(a)(2)(A) [fraud with respect to Aliant Bank loans]; Count II—Section 523(a)(6) [conversion of construction loan proceeds to personal use], Count III—Section 727(a)(4); Count IV—Section 727(a)(5) [failure to explain deficiency of assets].

(4) Adv. Pro. No. 00–99 [Tom McGregor, Trustee], Section 727(a)(3) [failure to keep and preserve records].

## II. FINDINGS OF FACT

### A. BACKGROUND

James G. Wynn filed a joint petition, together with his wife Lee'Sha, pursuant to Chapter 7 of the Bankruptcy Code on October 18, 1999. Wynn also filed Schedules of Assets and Liabilities and a Statement of Financial Affairs with his petition. Schedule A, which calls for the debtor to list all real property owned, reflects four separate parcels, with a total value of $950,000. Schedule B, Line 15 indicates an account receivable in the amount of $5,000 for the construction of a home. Line 23 on Schedule B reports that the debtor owns 10 vehicles. Also on Schedule B, Wynn reports that he owns a 30' Carver Santego boat, which he values at $44,000 and a Wave Runner, which he valued at $3,500.

Looking at the liability side of the picture, on Schedule D, which calls for a complete listing of secured indebtedness, Wynn reports secured debt of over $900,000. Schedule F, which calls for a complete listing of unsecured indebtedness, schedules more than thirty creditors holding a total of almost $100,000 in unsecured debt. In round numbers, Wynn reports approximately $1,000,000 in assets and roughly an equal amount in debt. Review of Schedules D and F reveal that in almost all cases, Wynn failed to state the date the indebtedness was incurred. The date when an indebtedness is incurred is frequently material in making the determination whether a debtor is acting in good faith. Wynn's failure to supply the "date incurred" information on Schedules D and F is material and appears to be part of a systematic attempt on his part to deceive his creditors, the Trustee and the Court.

Reviewing the Statement of Financial Affairs, Question Number 1 calls for the Debtor to "state the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business from the

beginning of this calendar year to the date this case was commended. State also the gross amounts receive during the two years immediately preceding this calendar year." In response, Wynn disclosed that he had received $23,000 for the year from the Fire Department and that $26,500 had been received for each of the two prior calendar years. No other amounts were disclosed. Notwithstanding the fact that Wynn had been actively engaged in both the home building business and that he sold used cars, no gross income from those activities were reported. In light of all of the evidence adduced at trial, this was a material omission from the schedules.

Question Number 2 of the Statement of Financial Affairs calls for the Debtor to report his income from activities other than employment or operation of business. Wynn disingenuously responded to that question as follows: "there was no profit in construction of homes." As was clear from Wynn's testimony at trial, he was very actively engaged in the construction of homes. He was on the job sites supervising all of the construction activities and did much of the work with his own hands. Wynn was not a passive investor but an active proprietor engaged in business. Question Number 1 calls for the Debtor to disclose his "gross income." Wynn's response to question Number 2, that there was no profit, was a calculated attempt to evade the requirement that he disclose his gross income. Indeed, after two years of litigation and four full days of trial, the Court still cannot determine Wynn's gross income.

Gross income is the total amount received from all business activities, before deducting business expenses. It is significant that Question Number 1 calls for gross income and not net profit. To state the conclusion that there was no profit, without providing information as to the amount of gross income, is a complete evasion of the question. Gross income is an important piece of information because it quickly gives the reader an idea as to the size of the debtor's business. A debtor with one million dollars per year in gross income is a far different entity than one with gross income of ten thousand dollars. Indeed, most businesses which file bankruptcy have not shown a profit in the most recent years. To get an idea as to the magnitude of the debtor's business, one first looks at the gross income figure. Wynn answered Questions Number 1 and 2 in a manner calculated to obscure the nature and magnitude of his business enterprises.

A reader of the schedules and statements in this case might wonder how an individual can support a wife and two children on $26,000 per year and yet accumulate $1,000,000 in assets and incur $1,000,000 in liabilities. The evidence revealed that Wynn had gross income considerably in excess of $26,000 per year. In addition to Wynn's income as a fireman, he had at least two other business activities during the period of time encompassed by Question No. 1 to the Statement of Financial Affairs. Wynn was actively engaged in the business of building homes during the period of time encompassed by Question No. 1, yet failed to disclose that gross income. In addition, Wynn was also engaged in the business of selling used cars. No mention of the used car business was made in the Statement of Financial Affairs. The failure to disclose very substantial amounts of gross income in response to Question Number 1 of the Statement of Financial Affairs was a false account knowingly made by Wynn for the purpose of deceiving his creditors. Moreover, Wynn's books and records were insufficient to explain how he had come to arrive in his financial condition.

## B. ALIANT BANK

### 1. Lot 12, Driftwood

Wynn purchased land known as Lot 12, Driftwood Subdivision in Elmore County for $92,500 on November 24, 1997, for the purpose of building a residence for resale. The Court will refer to this project as "Driftwood." Wynn borrowed funds from Aliant Bank to purchase the land, which is adjacent to Lake Martin. Wynn entered into an agreement with Aliant Bank on December 22, 1997, for a construction loan for a residence which was to be build on Lot 12. The original note and mortgage were in the amount of $223,500.00. *See* Aliant Exhibit 1. Paragraphs 7 and 8 of the Construction Loan Agreement provide, in part, that:

> 7. Borrower shall, on each check used to pay costs related to the Project, identify the bill, invoice or statement being paid and the Project (by reference to the lot and block number or other identification of the Real Estate satisfactory to Lender).
>
> 8. Borrower shall use the Loan proceeds only for the purpose of constructing the Project and for the payment of debts created in connection therewith and shall no commingle any of the loan proceeds or any of the funds of Borrower which are to be invested in the Project with the proceeds of other Lenders or other loans or use any of the Loan proceeds for the construction of another project.

2. Aliant Exhibit 2, which is a Note History, indicates a disbursement of $92,670.47 on December 23, 1997. In addition, Aliant Bank Vice President Lawrence B. McLemore testified to that effect.

3. While it is theoretically possible that Wynn could have prepaid construction expenses, the Court rejects any suggestion that this

### 2. Disbursements prior to February 26, 1998

The construction loan satisfied the loan which was made to purchase the land.[2] On February 26, 1998, Wynn wrote check No. 158 out of the Aliant Bank account (No. 55001386) to cash for $1,500.00. The notation on the check was that it was for "dirt work." While the notation did not further identify what was meant, the Court finds, based upon testimony given by Wynn and other testimony, that this was the first work done on the Driftwood project. If the "dirt work" was not done until February 26, 1998, disbursements made prior to that time would necessarily have been for projects other than Driftwood or for personal uses, all contrary to express conditions in the construction loan.[3]

The Aliant Note History indicates that the following disbursements were made during this period. *See*, Aliant Exhibit 2.

| | |
|---|---|
| 12/23/97 | $10,000 |
| 1/7/98 | 5,000 |
| 1/13/98 | 5,000 |
| 1/21/98 | 10,000 |
| 2/3/98 | 10,000 |
| 2/26/98 | 5,000 |
| Total | $45,000 |

As the $1,500.00 check written to cash was the only amount properly attributable to the Driftwood project during this time frame, and as the balance in the Aliant account as of February 28, 1998 was only $3,027, the Court concludes that in excess of $40,000 of the Aliant note proceeds had been converted by Wynn either to personal use or for other projects, contrary to the covenants contained in Paragraphs No. 7 and 8 of the construction loan agreement.

may have happened in this case. The only reasonable conclusion to be drawn from the evidence here was that Wynn diverted the advances on the Aliant note made prior to February 26, 1998 to uses other than the construction of a residence on the Driftwood property.

Review of the checks written during this time frame further support the conclusion that Wynn had engaged in fraud and that he was wrongfully converting the proceeds of the Aliant loan to his own uses. Check No. 101, in the amount of $1,000.00, was written to Colonial Bank. Colonial Bank is another plaintiff in this Adversary Proceeding. Thus, it appears that Wynn was "robbing Peter to pay Paul" that is, he was taking Aliant loan proceeds to pay Colonial at least as early as December of 1997.

On January 21, 1998, Wynn wrote check No. 125 on the Aliant account to Harden's Hardware in the amount of $5,120.20.[4] Harden, another plaintiff in this Adversary Proceeding, supplied building materials to Wynn. As Wynn did not do the "dirt work" or lot preparation until February 26, 1998, this payment was necessarily for materials which were used on another project. This is so because the dirt work or lot preparation is necessarily the first actual construction work to be completed.

Also during this time period, Wynn wrote 15 checks for a more than $18,000 for cash. This does not include the $1,500.00 check, payable to cash, for the dirt work. Wynn did not keep any records as to what this money was used for. Wynn testified that he frequently wrote checks to cash and would pay subcontractors. No doubt this was true in at least some cases. However, Wynn certainly used some of the proceeds for personal use, or perhaps has secreted some of these funds. Wynn does not have any records to show what happened to the cash withdrawals from the various bank accounts.

This time period, from December 22, 1997 to February 22, 1998, is useful because it can be determined that no work was done on the Driftwood project, except for the dirt work. The checks to Harden's hardware, Area Concrete and Attic Insulation Co. were clearly used for other projects. Large checks payable to cash, American Express and otherwise unidentified individuals[5] were certainly used for purposes other than to advance the Driftwood project. Wynn began to draw against the Aliant Bank loan immediately after it was approved, yet the dirt work did not begin until February 26, 1998, some three months later.

### 3. The denouement

In June of 1999, the Aliant Bank loan was increased from $223,500.00 to $265,000.00. Later that year, Aliant foreclosed its loan on the property. Senior Vice President Thomas R. Peacock inspected the house on November 23, 1999. He disparagingly referred to the project as a "cream puff," which he explained meant that the house looked good on the outside but that there was nothing inside. Peacock testified, and the Court finds, that the house was only 49% complete. Aliant Bank Executive Vice President Lawrence B. McLemore testified, and the Court finds, that Aliant Bank lost $112,899.20 on the Driftwood loan.

When Wynn borrowed the money from Aliant Bank for the Driftwood project, he promised that it would be used in the construction of the project. Most of the money was used for other projects or per-

---

**4.** A copy of this check may be found with January, 1998 Aliant Bank Statement. *See* Aliant Exhibit No. 3.

**5.** Aliant Exhibit 7 is a list of Subcontractors which Wynn used. Aliant Bank would infer from this that any checks payable to individuals not on the list are necessarily for personal

or non-business expenditures. Perhaps so, or perhaps this is yet another example of Wynn's incomplete record keeping system. In any event, very few of the expenditures made by Wynn can be traced, with any degree of confidence at all, to the Driftwood project.

sonal expenditures of Wynn, all to the detriment of Aliant Bank. Given the timing of the execution loan documents, the immediate draws against the loan for non-project purposes and the delay in starting the Driftwood project, the Court finds that Wynn intended, at the time he entered into the Aliant construction loan agreement, to use the money for non-project purposes and thereby defraud Aliant Bank.

### C. O.C. HARDEN

#### 1. The Highway 14 Project

On April 16, 1999, Wynn borrowed $147,750.00 from Union Planters Bank (formerly First National Bank of Wetumpka, Alabama) for the purchase of land and construction of a residence in Elmore County. *See* Harden Exhibit 3. As the property is located on Highway 14, the property will be referred to as the Highway 14 property. Matt Rogers of Union Planters Bank made the loan to Wynn and testified that it was agreed that the proceeds of the loan were to be used to purchase land and fund construction of a residence on the subject property.

Rogers testified that advances were made on the loan as follows:

| | | |
|---|---|---|
| 4/20/99 | $49,811.45 | (for purchase of land) |
| 4/20/99 | 10,000.00 | |
| 4/23/99 | 5,000.00 | |
| 4/29/99 | 5,000.00 | |
| 4/29/99 | 5,000.00 | |
| 6/4/99 | 15,000.00 | |
| 6/17/99 | 5,000.00 | |
| 8/2/99 | 5,000.00 | |
| 8/11/99 | 10,000.00 | |
| 8/27/99 | 5,000.00 | |
| 9/7/99 | 5,000.00 | |

*See also* Harden Exhibits 15 and 16. In addition to the $49,811.45 advanced for the purchase of the land, Union Planters advanced an additional $70,000.00 under the loan. The last advance was made on September 7, 1999. Rogers testified that the further advances on the loan were not allowed as Union Planters Bank was not satisfied with the progress on the residence. Rogers testified that, at the time the loan was cut off, there was no roof on the house, no siding, no doors and only a few windows. Yet, 70% of the funds which were intended for construction had been advanced. Mere inefficiency does not explain this disparity. Wynn necessarily used a very substantial portion of the loan proceeds for purposes other than construction of the residence, contrary to his representations to Union Planters Bank.

#### 2. Harden's Hardware Store

Plaintiff O.C. Harden is the proprietor of a hardware store in Eclectic, Alabama and has been in business since 1951. Harden's General Manager is Mike James, who has been employed by Harden for eleven years. Both Harden and James testified that they knew Wynn and had done business with him in the past. They discussed with him a project for the construction of a residence on the Highway 14 property. Harden agreed to extend credit to Wynn for the project based upon Wynn's representation that he had obtained financing from Union Planters Bank. Harden did not believe that Wynn had sufficient capital of his own to fund the construction of the project and would not have advanced materials on credit unless he had adequate financing from a bank. Harden testified that it was his policy to bill at the end of each month for materials purchased that month. The bills were due on the 10th of the following month.

Mike James testified that Wynn approached him in March or April of 1999, with a set of house plans for the residence to be constructed on the Highway 14 property. James examined the plans and drew

up a bill of materials.[6] *See* Harden Exhibit 4. This document is a detailed list of the type and quantity of materials which would be needed to build the residence. James further extended the price for each type of material. The purpose of this document was to list precisely what materials would be needed and how much it would cost. It was James practice to provide such detailed information upon the request of his customers.

James testified that the first substantial purchase of materials was made for the Highway 14 on August 11, 1999. *See* Harden Exhibit 20. Harden's Hardware delivered materials directly to the job site. The last delivery that was made to the Highway 14 site was on September 24, 1999. James and Harden made two visits to the job site after the September 24 delivery. Harden was dissatisfied with several aspects of the project. First, there was no construction activity taking place at the site. Second, materials which had been delivered to the property had not been properly protected from the elements. Harden testified that treated lumber was set directly upon the bare ground. In his opinion, this was not a proper manner in which to store construction materials. Most importantly to Harden, Wynn was in default of his obligation to Harden in the amount of $23,792.87.

Of considerable interest are the differences in what Harden and James observed during their two visits to the site, made after September 24. During the second visit, it was observed that materials which had been delivered to the site and which were present during the first visit had been removed from the Highway 14 site some time after the first and before the second visit. For example, 28 windows had been delivered to the site, yet only 20

had been used in construction. Eight windows had been removed by Wynn and presumably used elsewhere. In addition, only one-third of the lumber delivered by Harden had actually been used in the construction of the property, the remainder had been removed between the time of the first and second post-September 24 visits. James examined the construction and estimated that the residence was only 30% complete. Harden refused to extend Wynn any further credit after this time.

If one compares the timing of the withdrawals against the Union Planters Bank loan with the purchases of materials from Harden's Hardware, it is clear beyond all peradventure that most of the $70,000.00 advanced was used for purposes other than the construction of the Highway 14 project. Moreover, almost none of the materials purchased from Harden's Hardware were paid for with funds from the Union Planters Bank loan.

One last bit of Wynn's duplicity, with respect to this project, should be noted here. The bill of materials prepared by James in March or April of 1999, was used by Wynn to deceive Union Planters Bank. Matt Rogers testified that he became concerned about the progress of the Highway 14 job. Specifically, substantial advances had been made which appeared to far exceed the progress on the job. Rogers became concerned with this disparity and voiced his concerns to Wynn. To mollify Rogers, Wynn provided a copy of the bill of materials which had been prepared by James and led Rogers to believe that advances against the loan had been used to purchase the materials for the job. In fact, the materials purchased from Harden were made on credit.

**6.** The term "bill of materials" is the Court's terms and not James. Harden's Exhibit 4 will be referred to as a "bill of materials" for purposes of this Memorandum Decision.

Wynn's fraud, with respect to the Highway 14 job, was three-fold. First, most of the money advanced by Union Planters was used for purposes other than the construction of the Highway 14 job. Second, Harden was advised that funds would be available from the Union Planters loan to pay for materials purchased on credit when, in fact, it was Wynn's plan to use the Union Planters loan to fund other projects. Third, Union Planters was told that funds advanced under the loan were used to purchase materials from Harden's Hardware. All three of these misrepresentations made by Wynn were false and known by him to be false at the time he made them. Moreover, Wynn intended that Union Planters Bank and Harden would be deceived and defrauded by these misrepresentations. Harden's reliance upon Wynn's misrepresentations was justifiable, under the facts and circumstances here. Lastly, both Union Planters Bank and Harden's Hardware were damaged by these misrepresentations. Harden suffered damages in the amount of $23,792.87.

### D. COLONIAL BANK

Colonial Bank financed the construction of two residences which were built, at least in part, by Wynn. Colonial loaned Wynn $125,000 for the construction of a residence which was described as Lot 13 Summer Place, which is situated in Elmore County, Alabama. On April 20, 1997, an additional $15,050.00 was advanced. Colonial also financed construction of a residence described as Lot 6 Summer Place. $120,000 was loaned by Colonial on February 17, 1997 and an additional $30,000 was loaned on September 2, 1997.

Colonial filed a four count complaint in this adversary proceeding. Counts II, III and IV made claims under Section 523(a), alleging fraud, false financial statements and breach of a fiduciary capacity. At trial, Colonial focused the bulk of its attention on Count I, its Section 727(a)(3) claim, virtually ignoring its Section 523(a) claims. Indeed, in its proposed Findings of Fact and Conclusions of Law, Colonial did not even mention its Section 523(a) claims, electing to focus its attention on its Section 727(a)(3) claim. Accordingly, the Court will not undertake a detailed discussion of the construction of the Lot 6 and Lot 13 Summer Place projects.

### E. WYNN'S AUTO SALES

Wynn disclosed in his petition in bankruptcy that he had done business as Wynn's Auto Sales during the six years preceding the date of the petition in bankruptcy. Indeed, in a financial statement dated October 1, 1997, provided by Wynn to Colonial Bank, Wynn claimed that he had equity in the amount of $114,501 in his auto business. *See* Colonial Exhibit No. 1. Wynn attached a Balance Sheet dated October 1, 1997, for Wynn's Auto Sales to his financial statement. That financial statement indicated that Wynn's Auto Sales had accounts receivable in the amount of $33,192 and inventory in the amount of $152,920.

Also of interest is the balance in the checking account with the title "Wynn Auto Sales." This checking account is assigned account number 1015 on the Trial Balance. The Trial Balance documents report that the Wynn Auto Sales checking account had a balance in the amount of $24,666.57 at the end of the years 1997, 1998 and 1999. *See* Defendant's Exhibits 2, 3 and 4. If these documents are correct, Wynn must have converted this money to his own use, defrauding the estate. More likely, the trial balance figures are pure fiction. In any event, the $24,666.57, which Wynn reports as having been in the Wynn Auto Sales checking account was never turned over to the Trustee. There-

fore, Wynn either converted those funds to his own use or misrepresented his business affairs to the Trustee and his creditors.

Wynn produced no records for his Auto Sales business. When confronted with Colonial Exhibit No. 1, his signed financial statement, Wynn objected to its admission on the grounds that Colonial could not establish that it relied upon the financial statement in connection with any of its loans to Wynn. The Court sustained Wynn's objection, insofar that the financial statement was admitted only as a statement of his financial condition, but not for the purpose of reliance on the part of Colonial Bank.[7] Wynn did not deny that it was in fact his financial statement or offer any evidence that the document had been forged by Colonial Bank. Indeed, the Court notes that the signature of Wynn's financial statement is identical to the signature on the petition in bankruptcy filed with the court.

Wynn testified that he sold most of his automobiles on credit, collecting either weekly or monthly payments, over a period of two to three years. Doing business in such a manner, Wynn would have needed records as to the receipt of payments from those who purchased on credit. Wynn did not produce any such records and was vague as to how he kept track of what was owed. To prepare the attachments to his financial statements, Wynn must have had a system of records and probably an accountant to keep the records and prepare the financial statement, as Wynn did not have any formal training as an accountant and most likely could not have prepared the balance sheets on his own. The balance sheets which were attached to Wynn's financial statement given to Colonial Bank were probably prepared by an accountant or someone with at least some training. Assuming that the figures

in the balance sheets were not fabricated out of thin air, Wynn must have had a set of records to support the balance sheets. Yet no such records were produced.

The Court concludes that Wynn has concealed, destroyed or failed to keep and preserve recorded information from which his financial condition or business transactions, with respect to Wynn's Auto Sales might be ascertained. Wynn's Auto Sales had substantial assets at least as late as October 1, 1997. Wynn could produce no records which could explain what happened to those assets. Almost $200,000 worth of assets in the Auto Sales business were dissipated between October 1, 1997, and October 18, 1999 (the date of the petition). Wynn has offered no cogent explanation and can produce no records as to the disposition of these assets.

### F. WYNN CONSTRUCTION

As discussed above, Wynn did not disclose the amount of gross income for Wynn Construction in response to Question Number 1 of the Statement of Financial Affairs. In spite of repeated requests from the Trustee and several creditors for detailed financial information, Wynn still has not disclosed his gross income. At trial, Wynn submitted several documents which purport to be Trial Balances and General Ledgers for the years 1996, 1997, 1998 and 1999. *See* Defendant's Exhibits 1 to 4 inclusive. These documents are computer runs which were prepared by Ramona Blankenship, an accountant who was retained by Wynn after he filed his petition in bankruptcy. The first thing one notices when examining these documents is that they indicate a "run" date of October 17, 2000. Ms. Blankenship testified that these documents were first run on her computer on October 17, 2000, one

---

7. The Financial Statement was dated October 1, 1997 but signed January 23, 1998.

year after Wynn filed bankruptcy and over three years after the close of the year 1996. Blankenship further testified that she prepared these documents based upon source documents provided by Wynn, such as cancelled checks and bank statements. Blankenship further testified that very few of the checks contained notations indicating what they were for and that there were virtually no documents "backing up" the checks. That is, Wynn did not retain documents supporting any of the expenditures. A "back up" document is a document which supports a book entry. The best kind of "back up" documents are prepared by someone other than the debtor to support the expenditure of funds. The most common examples would be bills and invoices issued by trade creditors. Another good "back up" document is one which is prepared at or near the time a transaction takes place. Examples are check registers, journals, and memoranda. The assignment of expenditures into specific categories of expenses was done almost exclusively upon the word of the Debtor. Therefore, it is impossible to determine whether the classification of any given expenditure is correct.

The credibility of documents such as these General Ledgers is, to say the least, suspect. In general, business documents such as general ledgers have veracity because they are summaries of transactions which were prepared substantially contemporaneously with the event. For example, if the Debtor were to purchase $500.00 worth of supplies and make a book entry a short time thereafter, while the event was still fresh in his mind and source documents at hand, it is much more likely that the entry would be accurate than if the book entry were made four years later, after source documents had been discarded, solely in reliance upon the Debtor's not so fresh recollection.

Even more damaging is the fact that the General Ledgers here were not prepared for any business purpose, but rather in an effort to defend an adversary proceeding where the Debtor's discharge is at stake. A debtor who prepares business records for use in managing his business has a very strong incentive to make sure his records are accurate. Business records are of no use in the management of a business unless they are accurate. For this reason, business records prepared to assist in the operation of a business have a high degree of credibility. On the contrary, business records which are prepared long after the fact, solely to defend a lawsuit, have much less credibility. Such is the case here, Wynn did not use Exhibits 1, 2 and 3 to assist him in any way in the operation of his business. Rather, they were prepared solely to defend this adversary proceeding.

Examination of Wynn's General Ledgers reveal that they are grossly incomplete and, in many ways, grossly inaccurate. For example, under cross examination, Wynn testified that during 1998 he had at least seven projects under way: (1) an A-frame house for Adcock; (2) A-frame additions for Ellis; (3) a project for a hot tub, deck and gazebo; (4) a seawall for Rachel Tripp; (5) Driftwood house; (6) a window replacement job; (7) home in Pintlala for Hunnicut. Wynn's records do not reflect any income or revenues relating to any of these projects. Some of the expenditures for these projects have been grouped by project, however, examination of these accounts indicate that it was done in an arbitrary and haphazard fashion.

While Wynn's records are, on their face, inadequate, careful examination of the records reveals even deeper problems. For example, on December 27, 1997, Wynn wrote check No. 108 on the Aliant account

for cash in the amount of $2,000.00.[8] Yet if that check is found in Wynn's General Ledger, it indicates that this $2,000.00 payment was made to Wallace Money.[9] Further testimony revealed that Wallace Money is Wynn's step-father. On January 28, 1998, Wynn wrote check No. 130 to cash in the amount of $1,770.00. *See* Aliant Bank Exhibit 3, January, 1998 Statement. Again, Wynn's General Ledger indicates that this payment was made to Wallace Money. *See* Defendant's Exhibit 3, General Ledger page 1. While the Court will not attempt to perform a complete audit of Wynn's General Ledgers, it has heard sufficient testimony and examined a sufficient number of documents to conclude that the General Ledgers are inaccurate in material respects as well as incomplete.

### III. CONCLUSIONS OF LAW

#### A. JURISDICTION

This Court has jurisdiction to hear this case pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(J) and (I).

#### B. INTRODUCTION

The goal of any individual who files a petition in bankruptcy pursuant to Chapter 7 is to obtain a discharge of his indebtedness. *See* 11 U.S.C. § 727. If a discharge is granted pursuant to Section 727, with only a few exceptions, the debtor is no longer required to pay those debts which were incurred prior to the time the petition was filed. *See* 11 U.S.C. § 524. A creditor who seeks to prevent the discharge of his claim against the debtor has two avenues available to him. First, he may object to discharge. *See* 11 U.S.C.

§ 727(c)(1). If the creditor is successful, none of the debtors debts are discharged. From the Debtor's point of view, this is a disaster as he has failed obtain the sought after discharge. Ironically, this is not always the best result for the creditor as none of the debts are discharged and the creditor must compete with other creditors to collect his claim from the debtor.

The second avenue available to a creditor is to obtain a determination from the Bankruptcy Court that his claim is excepted from discharge. *See* 11 U.S.C. § 523. In such a case, the debtor receives his discharge under Section 727 and does not have to pay any of his debts, except that debt owed to the creditor who brought suit under Section 523. In this case, suit was brought by the Trustee to deny discharge under Section 727 as well as by three creditors who sought to obtain a determination of nondischargeability pursuant to Section 523 in addition to bringing their own Section 727 claims. For the reasons set forth below, this Court denies discharge pursuant to Section 727. As Mr. Wynn will not receive a discharge pursuant to Section 727, the Court need not reach the questions as to whether the debts owed the three creditors who are plaintiffs here are excepted from discharge pursuant to Section 523.

#### C. SECTION 727(a)(3)

#### 1. WYNN FAILED TO KEEP AND PRESERVE RECORDS FROM WHICH HIS FINANCIAL CONDITION AND BUSINESS TRANSACTIONS MIGHT BE ASCERTAINED

Section 727(a)(3) provides as follows:

8. Aliant Bank introduced as its Exhibit 3, bank statements with copies of the actual checks written, for every month from December, 1997 to October, 1999. Check No. 108 therefore is identified as Aliant Bank Exhibit No. 3, January, 1998 Statement.

9. Defendant's Exhibit 2, page 1 of the General Ledger.

(a) The court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case

11 U.S.C. § 727(a)(3).

■ The purpose of this statute is "to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir.1999)(citing *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1401 (9th Cir.1990)(quoting *In re Underhill*, 82 F.2d 258, 260 (2nd Cir. 1936))). The Trustee and creditors are to receive sufficient information to enable them to "trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions." *In re Scott*, 172 F.3d at 969 (citation omitted). "Creditors are not required to risk the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records." *Id.* (citing *In re Cox*, 904 F.2d at 1401 (quoting *Burchett v. Myers*, 202 F.2d 920, 926 (9th Cir.1953))).

■ The Plaintiffs have the initial burden of proof, to show that the debtor's books and records are inadequate. *See Fed. R. Bankr.P.* 4005; *Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3rd Cir.1992). *See also Matter of Oesterle*, 651 F.2d 401 (5th Cir.1981). That is, the Plaintiffs must show that the Debtor failed to keep books or records from which his financial situation could be ascertained. *See* 11 U.S.C. § 727(a)(3). Once the Plaintiffs have met this burden, the burden of production

shifts to the debtor to justify the lack of adequate record keeping. *See Fed. R. Bankr.P.* 4005; *Meridian Bank v. Alten*, 958 F.2d 1226 (3rd Cir.1992). *See also Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294 (9th Cir.1994); *Vetri v. Meadowbrook Mall Company*, 174 B.R. 143 (M.D.Fla. 1994); *Anderson v. Wiess (In re Wiess)*, 132 B.R. 588 (Bankr.E.D.Ark.1991). "Whether a failure to keep or preserve records is justified is to be decided 'under all of the circumstances of the case'." *Anderson v. Wiess (In re Wiess)*, 132 B.R. at 592. *See Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880 (6th Cir. BAP 1999)(subcontractor who kept most of his records in his head denied discharge); *State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831 (Bankr. E.D.N.Y.2000) (tax returns not sufficient to meet requirements of Section 727(a)(3) where debtor had considerable real estate transactions); *First Union National Bank v. Golob (In re Golob)*, 252 B.R. 69 (Bankr. E.D.Va.2000) (business owner denied discharge for failure to keep records to explain material business transactions); *Pittsburgh National Bank v. Buzzelli (In re Buzzelli)*, 246 B.R. 75 (Bankr.W.D.Pa. 2000) (ophthalmologist's failure to keep records of his practice and substantial non-business transactions resulted in denial of discharge); *Chemical Bank v. Hecht (In re Hecht)*, 237 B.R. 7 (Bankr.D.Conn.1999) (business owner denied discharge because he could not produce records from which one could trace financial history); *Freedman v. Boone (In re Boone)*, 236 B.R. 275 (Bankr.M.D.Fla.1999) (business owner denied discharge because he could not produce records to explain $107,000 reimbursement of personal expenses).

■ The Bankruptcy Code does not require a debtor who is seeking a discharge to maintain any specific type of

records, nor does it require an impeccable system of bookkeeping. *See Meridian Bank,* 958 F.2d at 1230. However, the records must "sufficiently identify the transactions [so] that intelligent inquiry can be made of them." *Id.* "The test is whether there [is] available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained." *Id.* Several factors may be taken into account by the Court when determining the adequacy of the records, including debtor's education, the sophistication of the debtor, debtor's business experience, the size and complexity of debtor's business, debtor's personal financial structure, and any special circumstances that may exist. *In re Wiess,* 132 B.R. at 592 (citing *Matter of Watson,* 122 B.R. 476 (Bankr. M.D.Ga.1990); *In re Mart,* 87 B.R. 206 (Bankr.S.D.Fla.1988)). However, a corporate or a business debtor should be held to a higher level of accountability in record keeping. *See Meridian Bank,* 958 F.2d at 1226. *See also Hutzelman v. Luhman (In re Luhman),* 146 B.R. 163 (Bankr.W.D.Pa. 1992).

■ The Court finds that Wynn's records are inadequate for five reasons. First, there is no accounting for or disclosure of total gross revenues. Second, no supporting documentation was kept or preserved which would show the purpose for expenditures made by check. It is impossible to assign any given expenditure to any particular project or segregate business transactions from personal transactions. Third, there is no accounting for large cash disbursements made in currency. Fourth, there was no accounting for assets either in the General Ledger or otherwise. Fifth, liabilities were not tracked with any degree of precision either in the General Ledger or otherwise.

The first major problem area is Wynn's complete failure to account for his gross income. The first step in determining one's financial condition is to determine one's gross income. The larger the gross income, the larger the business enterprise. When gross income is not disclosed, it is very difficult, if not impossible, to determine the nature of the business enterprise. Moreover, it is not possible to determine whether a debtor has diverted income where there is not a complete accounting.

The second problem area was the complete lack of any support for expenditures. While Wynn did provide what appears to be a fairly complete listing of expenditures made by check, it is impossible to determine what the expenditures were for or whether they were business or personal in nature. Many of the expenditures were assigned a classification by Ramona Blankenship, however, she admitted that almost all of the information supporting the classification came from Wynn who merely answered off the top of his head, without any supporting documentation. Given the sheer number of transactions involved, not to mention Wynn's lack of credibility, the accounting for expenditures by check is inadequate.

The third problem area was the large volume of cash, that is currency, transactions, completely unsupported by any kind of documentation. Wynn's records reflect numerous, large cash withdrawals from his bank accounts. Wynn admitted that he did not keep any record as to how the cash was paid out, or for what purposes. Wynn claimed that subcontractors would demand cash because his job sites were some distance from the bank. Such an explanation strains credibility. Assuming for the sake of argument that Wynn had a legitimate business reason for dealing in currency, it is completely outside the bounds of logic that he would not have kept a record as to

his cash disbursements. If a dispute had arisen between Wynn and a subcontractor as to whether a given payment had been made, he would have nothing to support his oral claim that a given individual had been paid. Prudence would dictate that each cash disbursement would be recorded at the time it was made. A careful businessman would ask the payee to sign a receipt evidencing that a given cash disbursement had been received by the payee. Dealing in large amounts of currency without adequate controls provides an excellent opportunity for fraud, theft and defalcation.

The fourth problem area is the Debtor's failure to track the acquisition and disposition of assets. The schedules on file in this case report that the Debtor owns assets with an approximate total value of $1,000,000. The Debtor's records do not explain the acquisition of these assets or the disposition of any assets. It is not possible to reconcile the Debtor's General Ledger to the schedules.

The fifth problem area, which relates to the fourth, is that the Debtor's records do not track liabilities. In this case, most of the debt is secured. Therefore, there should be a close correlation between the increase in the value of assets with the increase in the amount of secured debt. As a construction loan is drawn upon, the amount of the debt and the value of the related assets should increase proportionately. However, it is impossible to correlate assets and liabilities here.

Wynn operated two businesses, his auto sales business and construction business. Both of these business ventures appear to require at a minimum some sort of accounting system to keep track of certain items, i.e., inventory, receipts, invoices, titles, accounts, expenses, etc. The evidence showed that a substantial amount of money had been loaned to Wynn in order for him to build homes, and Wynn had several home building projects ongoing at the same time. With a large amount of money and multiple projects ongoing, the complexity of his business transactions suggest that Wynn should have kept at least something closely resembling an accounting system that would sufficiently identify his business transactions.

This Court, having some experience in looking at the records of both failed and going concern businesses, notes that one might expect to have found several types of records which were completely missing here. With respect to the auto sales business, one might expect to find a record as to the acquisition of each vehicle held for resale. One would reasonably expect to find details as to the purchase of each vehicle, such as the date of purchase, amount paid, name of the seller and a description of vehicle. A prudent businessman would keep records as to how much was spent to repair each vehicle so that he would know how much he could sell the vehicle for and make a profit. If vehicles were sold on credit, one would expect to find a promissory note or at least a contract setting forth the amount of the down payment and the obligation of the purchaser to pay the balance of the purchase price. One would also expect to find a ledger card to reflect the receipt of payments. While a debtor need not keep a perfect set of records, the complete lack of records with respect to the automobile sales business cannot be excused.

With respect to the home construction business one would expect additional records. First, one would expect a contract file on each project. The construction or renovation of a residence would usually entail a written proposal setting out what the contractor would build and how much he expected to be paid. One would also expect to find proposals from subcontractors, notes payable to banks, invoices from

suppliers, a building license and a host of other various and sundry documents. Very few documents were produced by Wynn.[10] Most of the documents produced by Wynn had been acquired by him through discovery of document requests made after he was in bankruptcy. That is, in most cases, Wynn would obtain documents through formal or informal discovery and then produce the same documents to his creditors from whom he had received them. This kind of game playing does not satisfy the requirements of 11 U.S.C. § 727(a)(3). Wynn had kept very few documents from which his business transactions might be determined.

Wynn offered Exhibit 35 into evidence, which is a contract dated January 25, 1999, on Wynn Lake Builders letterhead, is an example of a construction contract. It appears to be the only one produced by Wynn. The contract in incomplete as it does not contain Exhibit A, which is referenced in Article 1 of the contract. Article 5 of the contract provides, in part, that: "Any alteration or deviation involving additional materials and or labor costs, will be executed only upon a written order for same, signed by Owner and Contractor, and if there is any charge for such alteration or deviation, the additional charge will be added to the contract price of this contract." This suggests that Wynn did business by way of written contracts, and that changes to the contracts had to be in writing. That only one such document was produced, strongly suggests that others were lost or destroyed.

In summary, the records produced by Wynn were inadequate for the following reasons. First, there was no complete accounting for revenues received by Wynn either from his automobile sale business or his home building business. Second, disbursements made by check, many of which were disclosed in the general ledgers, had no supporting documentation available from which it could be determined whether disbursements were actually for the purposes indicated. Third, Wynn disbursed a considerable amount of cash, without keeping any record as how the money was spent. Fourth, the general ledgers do not reflect the acquisition or disposition of Wynn's assets and cannot be reconciled to the Schedules on file with the Court. Fifth, liabilities are not tracked in the general ledgers and cannot be reconciled to the Schedules.

This Court finds that Wynn did not keep sufficient records from which his financial condition and business records might be ascertained. With respect to Wynn Auto Sales, almost no records were kept. It is impossible to track the acquisition and disposition of automobiles or to determine whether a profit or loss was made on sale of automobiles. Indeed, Wynn did not maintain records as to the receipt of payments for the automobiles which he sold. As a business debtor, Wynn is held to a higher level of accountability in record keeping, and he has failed to adequately keep such records. Taking into account the Debtor's education, the size and complexity of the businesses of the Debtor, the Debtor's financial structure, and the Debtor's business experience, the Court finds that the Debtor did not keep adequate records in which his financial condition and business transactions could be ascertained.

**2. THE EVIDENCE IS INSUFFICIENT TO SUPPORT WYNN'S CLAIM OF A JUSTIFIABLE EXCUSE FOR THE FAILURE TO KEEP AND PRESERVE RECORDS**

■ Once the Plaintiffs make a prima facie case under Section 727(a)(3), the bur-

---

**10.** Wynn produced some documents of this nature, but they were insufficient to explain his financial condition. *See* Defendants Exhibits 5–13 and 16–21.

den shifts to the debtor to provide justification. *Meridian Bank v. Alten,* 958 F.2d 1226, 1233 (3rd Cir.1992).

> Just what constitutes a satisfactory explanation has not been expressly defined, but it probably means that the debtor must explain his losses or deficiencies in such manner as to convince the court of good faith and businesslike conduct ... An explanation which is based mostly upon an estimate of the debtor founded upon nothing by way of verification or affirmation by means of books, records or otherwise has been held unsatisfactory... More is required of the debtor in the way of explanation than mere generalities.

*Id.* at 1233 n. 6 (quoting 4 Collier on Bankruptcy, ¶ 727.08 (15th ed.1979)). Wynn concedes that "there were a few holes" in his records, but argues that the records are substantially complete. *See* Wynn's Suggested Findings of Fact and Conclusions of Law, p. 11. He further argues that "all the money went through the accounts." *Id.* The Court does not accept this assertion. First, Wynn does not account for the revenues which he undoubtedly received from his construction activities. Second, the very substantial cash transactions are not, in any way, explained. Wynn's claim that only $46,000 was payable to cash and that $32,000 was explained is plainly incorrect. *See* Wynn's Proposed Findings, p. 12. Rather, cash in that amount was withdrawn from the Aliant Bank account over a three month period in December, 1997 to February, 1998. Total cash withdrawals from all of the accounts over years 1997, 1998 and 1999, far exceed that amount. Moreover, Wynn did not tie the $32,000 allegedly spent on the project to the $46,000, to which he refers. Indeed, almost all of that $32,000 to which Wynn refers was spent on projects other than the Driftwood project, which was financed by Aliant Bank.

Where, as here, records are inadequate, it is easy to play shell games with large cash transactions. Wynn has completely failed to explain his business transactions.

The Court will comment on another troubling aspect of Wynn's prospect of paying subcontractors in cash. Wynn admitted that he did not issue his subcontractors Internal Revenue Service Form 1099, which is required when one in business pays more than $600 for labor or services. *See* 26 U.S.C. § 6041(a). Wynn called Demps Adams and Kenny Jones, two individuals who testified as to receiving cash payments from Wynn for construction work. Both Adams and Jones admitted that they did not pay income taxes on at least some of the cash received. The following three facts suggest that Wynn conspired with his subcontractors to defraud the Internal Revenue Service out of taxes. First, Wynn made large cash payments. Second, Wynn did not issue Internal Revenue Service Form 1099 to the payees. Third, Wynn did not keep or retain any records from which it could be determined, with any degree of accuracy, how much had been paid to any given subcontractor.

This evidence suggests that Wynn may have gained a competitive advantage by doing business in this manner. The Court infers from the evidence that a subcontractor may be willing accept less money for a given job knowing that he will not pay taxes. In effect, the subcontractor and Wynn as contractor share the proceeds of the fraud perpetrated upon the tax collector. While the evidence may not prove, beyond a reasonable doubt, that Wynn and at least two of his subcontractors are guilty of the crime of income tax evasion, this is not in issue here. The evidence is insufficient to support Wynn's defense, that this fraud somehow justifies his fail-

**304**

ure to keep records as required by the Bankruptcy Code.

Some of the most damning evidence of Wynn's failure to keep adequate books may be found by reference to Defendant's Exhibits 31 and 31, which were admitted into evidence over the vociferous objections of the creditors.[11] Exhibit 31 is Wynn's estimate of construction costs for the Driftwood project which was prepared by Wynn in November of the year 2000. Near the top of this document, in large block handwritten letters, Wynn states that "THESE ARE ESTIMATED COSTS." Wynn then proceeds to estimate the costs of construction of the Driftwood project, oblivious to the fact that this is tantamount to an admission that he had not kept adequate books and records of the actual costs of construction. That Wynn would attempt to estimate the costs of construction of a project that he undertook years before is, to say the least, ironic. Wynn should have kept a set of books from which he could have generated the information on the "CONSTRUCTION COST BREAKDOWN." That Wynn could not produce actual cost figures is precisely why his discharge is denied.

The Court finds that the manner in which Wynn did business and the way in which he has conducted himself throughout the course of this bankruptcy proceeding is calculated to frustrate and delay his creditors. He has carefully postured himself in an effort to make a show of cooperating with the Trustee and his creditors while frustrating their every effort. Having considered all of the evidence in this case, the Court finds that Wynn has failed to provide a justifiable excuse for his failure to keep and preserve records of his business activities.

**11.** The creditors objected on the grounds that they had not been provided these documents

**D. SECTION 727(a)(5)**

*WYNN SHOULD NOT BE GRANTED A DISCHARGE BECAUSE HE HAS FAILED TO EXPLAIN SATISFACTORILY, BEFORE DETERMINATION OF DENIAL OF DISCHARGE, LOSS OF ASSETS OR DEFICIENCY OF ASSETS TO MEET HIS LIABILITIES*

Section 727(a)(5) states:

(a) The Court shall grant the debtor a discharge, unless—

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727(a)(5).

Once the creditors have showed a basis for their objection, the burden of proof shifts to the Defendant to explain the loss of his cash assets in a satisfactory manner. *Fed. R. Bankr.P.* 4005; *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir.1984). "The question of whether a debtor satisfactorily explains a loss of assets is a question of fact." *Id.* A satisfactory explanation is one that convinces the court. *Id.* "Vague and indefinite explanations of losses such as 'monies were spent' or 'lost through gambling' without documents is unacceptable." *In re Goblick,* 93 B.R. 771, 775 (Bankr. M.D.Fla.1988). "The debtor will be required to produce some kind of direct, specific evidence in order to defeat an objection [of discharge] based upon failure to explain a loss of assets." *In re Ridley,* 115 B.R. 731, 737 (Bankr.D.Mass.1990) (citing *McBee v. Sliman,* 512 F.2d 504, 506 (5th Cir.1975)).

in advance of trial as required by the Court's Pretrial Order.

■ The Plaintiffs have sustained their burden in establishing that the Wynn has failed to account for money loaned by the various banks to him. Therefore, Wynn must satisfactorily explain the loss of said monies. However, he has failed to do so. Due to the Wynn's inadequate record keeping, it is impossible for this Court, or anyone, to accurately determine what happened to the monies loaned by the Plaintiffs and for what specific purpose the said funds were used. While Wynn testified said monies were used for various projects, he also testified that he comingled loan proceeds with personal funds to pay personal expenses. To further support the Court's findings, no documentation, such as receipts or invoices, were kept by the Wynn in which one could accurately account for these transactions.

An example of Wynn's lack of explanation of acquisition or disposition of assets is demonstrated by looking at Wynn's General Ledgers and Trial Balance. The Trial Balance and General Ledgers do not reflect, in any meaningful way, the reality of Wynn's financial condition. According to the testimony of Ramona Blankenship, she compiled this information from returned checks, check registers and bank statements and other records provided by Wynn. Apparently no attempt was made to reconcile these books and records with the Bankruptcy Schedules filed by the Debtor. For example, Schedule A indicates that Wynn owned four parcels of real property with a total value of $950,000 as of the date of the petition. These assets are not listed in either the December 31, 1998, or December 31, 1999, Trial Balances. *See* Defendant's Exhibits 3 and 4. Comparing Schedule B, which lists various items of personal property valued at over $90,000,

with Defendant's Exhibits 3 and 4, one can find no rational connection between the two. These records are of no use in attempting to determine the disposition of the Debtor's property.

The Court is struck by the discrepancy between the net worth figure in Wynn's October 1, 1997, Financial Statement (Colonial Exhibit 1) and the Trial Balance (Defendant Exhibit 2), the Financial Statement, which Wynn provided to Colonial Bank, reports a positive net worth of $465,981. Yet the Trial Balance dated December 31, 1997 reports retained earnings with a negative, or debit, balance of $99,938.00 and an owners draw balance of $28,747.87. The owners draw is the amount of money that Wynn admits taking out his business and not having repaid. Technically, retained earnings are the accumulated income or loss for the current and prior periods. However, Ms. Blankenship admitted that the retained earnings figure was a "plug" figure, that is one which is used to make the accounts balance. Indeed, as no income or loss figures were provided for any period, it would not be possible to directly calculate retained earnings.[12] What is striking is that Wynn claimed, in 1997, that he had a net worth of $465,000. One who knew nothing of Wynn except what was contained in his financial statement would conclude that he was a successful, well to do businessman. On the other hand, one reading his December 31, 1997, Trial Balance and General Ledger (Defendant's Exhibit 1) would conclude that he was deeply in debt. Every written statement made by Wynn is plagued with a complete lack of veracity.

Moreover, as demonstrated by the facts in this case, Wynn does not account for many of the substantial cash transactions

---

12. In the case of an individual, it is questionable whether the term "retained earnings" has any real meaning. The only term which is meaningful in the case of an individual is "net worth" or difference between total assets and total liabilities.

which he undertook during the operation of his construction business. The cash amounts which he withdrew from the Aliant Bank account over the three years in which he built homes well exceed $46,000.00. Wynn has provided no accurate accounting for the actual use of the said funds other than vague and self-serving General Ledgers which were produced mostly in reliance to his own memory. The Court reiterates that fact that very few of the checks in which the Debtor's accountant relied upon to draft the General Ledger contained notations indicating what they were for. She testified that there were virtually no documents "backing up" the checks. The assignment of expenditures into specific categories of expenses was done almost exclusively upon the word of the Debtor. No current or ongoing accounting was ever made by Wynn. Equally troubling is the fact that large checks payable to cash, American Express and otherwise unidentified individuals do not have back-up documents supporting how the funds were used.

### III. CONCLUSION

For the foregoing reasons, the Debtor is DENIED his discharge pursuant to 11 U.S.C. § 727(a)(3) and 727(a)(5). As the Court has determined that the Defendant is denied a discharge pursuant to 11 U.S.C. § 727(a)(3) and (a)(5), it is unnecessary for the Court to determine whether the debts in question are excepted from discharge under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B). Separate judgments consistent with this memorandum decision will be entered by the Court.

### JUDGMENT

For the reasons set forth in the Court's Memorandum Decision of this date, it is declared that the Trustee's complaint filed in this Court objecting to the discharge of

Defendant Lee'Sha F. Wynn, in Adversary Proceeding No. 00–99, is hereby DISMISSED, with prejudice.

### JUDGMENT

For the reasons set forth in the Court's Memorandum Decision of this date, judgment is entered for the Plaintiffs. As a result, the Debtor James G. Wynn is DENIED his discharge pursuant to 11 U.S.C. § 727(a)(3) and 727(a)(5).