In re Martha R. BAUER, Debtor.

Linda J. Miller, Plaintiff,

v.

Martha R. Bauer, Defendant.

Bankruptcy No. 01–52463.
Adversary No. 01–0234.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

March 31, 2003.

Linda J. Miller, Columbus, OH.

Linda Mosbacher, Gahanna, OH.

Michael D. Bornstein, Columbus, OH, for debtor.

Martha R. Bauer, Cape Coral, FL.

### MEMORANDUM OPINION AND ORDER

CHARLES M. CALDWELL, Bankruptcy Judge.

The Court submits this Memorandum Opinion and Order as its findings of fact and conclusions of law. This adversary proceeding was commenced by Linda J. Miller ("Plaintiff") against Martha R. Bauer ("Defendant"), to block the discharge of legal fees. 11 U.S.C. Secs. 523(a)(2)(A) and (4) ("Code"). In the alternative, the Plaintiff seeks the more comprehensive remedy of a denial of discharge of all scheduled debt. 11 U.S.C. Secs. 727(a)(2)(A), (3) and (5).

The Plaintiff represented the Defendant in a professional malpractice case against another attorney. The essential allegation is that after the Plaintiff obtained a judgment in the malpractice case, the Defendant fraudulently concealed and dissipated settlement proceeds in the amount of $100,000.00. The Defendant denies all the allegations. Further, she defends that the Plaintiff's legal services were defective, and that all rights to payment were abandoned, based upon the Plaintiff's alleged failure to provide appellate legal services.

Based upon the testimony, including the assessment of the relative credibility of the witnesses, a review of the evidence, pleadings and post trial memoranda, the Court has reached two conclusions. First, the Defendant has not offered any persuasive authority for the proposition that alleged defects in legal services or the failure to provide appellate representation, constitute defenses to fraud under the Code. At best, these assertions are a hindsight criticism of a legal strategy and representation that resulted in a $100,000.00 recovery for the Defendant. The difficulty and danger of hindsight assessments, are amply demonstrated by the conflicting testimony of the expert witnesses presented by the parties.

The Court has concluded that the representation issues are raised now only to justify the Defendant's failure to adhere to her contractual obligations, and her failure to be candid regarding the receipt and disposition of the settlement proceeds. The fact that a different strategy may have been employed to obtain more legal fees can not alter the fact that the proceeds received by the Defendant were realized only because the Plaintiff obtained a judgment. There can be no doubt that the Defendant substantially benefitted from the Plaintiff's legal services.

Second, the Plaintiff has established that the Defendant acted fraudulently by failing to turn over the settlement proceeds pursuant to their modified fee agreement. The Defendant concealed the true amount of the settlement, and engaged in a series of transfers to dissipate the funds, even in the face of a restraining order. This fraud leads the Court to conclude that not only should the indebtedness be excepted from the discharge, but also the actions of the Defendant rise to the level that she is not entitled to a discharge of any debt.

The history of this case began in 1993 when the Defendant was represented by George C. Georgeff ("Mr. Georgeff") in an appeal related to a domestic relation proceeding against her former spouse, Mark R. Hannum ("Mr. Hannum"). At one stage in the divorce case a settlement had been reached, but the Defendant claimed duress. The record indicates, however, that the domestic relations court enforced the terms of the settlement. This enforcement prompted the Defendant to appeal. It was in this process that the Defendant's malpractice claim against Mr. Georgeff arose. The Defendant claimed that Mr. Georgeff failed to file a transcript in a timely manner. Also, the Defendant claimed that after the attorney-client relationship was terminated, Mr. Georgeff failed to turn over all of the records.

On June 5, 1995, the Defendant, who is a paralegal, commenced a *pro se* malpractice action in the Franklin County Court of Common Pleas against Mr. Georgeff. She then contacted the Plaintiff to take over has her counsel. Given the nature of the allegations and potential litigation costs, the Plaintiff thought any recovery would be difficult. The Plaintiff recommended that settlement would be a preferable route, and given the time and work involved, the case would have to be handled on an hourly basis, rather than for a contingent fee.

On September 22, 1995, the Defendant signed an agreement to obtain Plaintiff's legal services at the rate of $100.00 per hour. A $1,500.00 retainer was paid, and it was to be replenished in $1,000.00 increments upon a ten-day notice. The agreement clearly indicates that the subject of the engagement was the Court of Common Pleas action that the Defendant had initiated against Mr. Georgeff. It makes no reference to appellate representation.

By November 26, 1995, this initial agreement proved too expensive for the Defendant, and on that date it was modified to waive the replenishment provision. It was superseded by an agreement to make monthly payments to the Plaintiff in the amount of $200.00 until the litigation was concluded and the fees were paid in full. Again, this modified agreement referred solely to the Common Pleas action. The Plaintiff was focused on trying to settle the case. This was based upon her assessment that given the nature of the allegations against Mr. Georgeff, it would be difficult to obtain a judgment.

A settlement conference was conducted on August 2, 1996. The Plaintiff testified that it did not go well because in her view both Mr. Georgeff and the Defendant were taking unreasonable positions. After the settlement talks, the Plaintiff and the Defendant returned to the Plaintiff's office. The Plaintiff testified that she sat down with the Defendant to have a discussion on the economics of the continued pursuit of the case, and in particular the significant likelihood that any recovery would be exhausted by the legal fees.

Even with this warning, the Defendant wished to continue, and according to the Plaintiff this prompted the execution of the second and final modification to the fee agreement in the form of an Addendum.

It was executed on August 2, 1996, and provided as follows:

> If a settlement is reached or judgment is obtained... all amounts collected...will first be applied towards attorney fees.... and I authorize Linda J. Miller to request that payments be made payable to Linda J. Miller and Martha R. Bauer. In the event that any check representing a settlement or award ... is made payable to Martha Bauer, (she) will endorse the check to Linda J. Miller immediately upon receipt, and Linda J. Miller has the right to deposit any such check in her trust account and upon notification to Martha R. Bauer, to withdraw the funds to the extent necessary to pay her outstanding legal fees. (emphasis supplied).

The Defendant offers a different story surrounding the execution of this Addendum. She asserts that it was signed under duress before the settlement conference. What is clear, however, is that this document was signed by the Defendant. It contained unequivocal terms that any funds received should be applied to fees, and that if any funds were forwarded to the Defendant, they were to be turned over to the Plaintiff, immediately.

In reliance on the Addendum, the Plaintiff continued her representation of the Defendant. The jury returned a verdict against Mr. Georgeff that included compensatory and punitive damages, and legal fees. On February 11, 1997, a Magistrate upheld the jury's $75,000.00 punitive damages award, and the Magistrate assessed attorney fees in the amount of $11,880.30. The total judgment was in the amount of $98,881.96. Three days later, on February 14, 1997, the Plaintiff corresponded with the Defendant. This letter included a copy of the Magistrate's decision, and indicated that a $23,881.96 settlement offer had been received. The Plaintiff speculat-

ed that there would be an appeal, and that the Defendant would have to retain someone to represent her interests. Also, the Plaintiff communicated that new payments terms would have to be worked out as follows:

> If you do wish for me to represent you in an appeal, ...the terms of my representation would include a $5,000 retainer; hourly rate (of) $120...; increase(d) monthly payment(s) on prior attorney fees to $350. In addition, I would ask for a note and a mortgage to secure the note for the prior attorney fees, as well as having Charles (Defendant's spouse) guarantee payment of all obligations to me. I wanted to give you an opportunity to consider what I would require, so that, should those terms be unacceptable to you, you would have sufficient time to find an attorney to handle your appeal....

Apparently, these terms were not acceptable because the Defendant retained another attorney, Robert J. Mann ("Mr. Mann") to defend the appeal and to prosecute her cross-appeal. Mr. Mann also represented the Defendant in Mr. Georgeff's chapter 13 bankruptcy proceeding by pursuing an objection to confirmation based upon bad faith. In re Georgeff, 218 B.R. 403 (Bankr.S.D.Ohio 1998). In addition, the Defendant retained a third attorney, Stephen L. Smith ("Mr. Smith"). He represented her in litigation in which Mr. Georgeff was awarded compensatory and punitive damages due to the Defendant's willful violation of the automatic stay. In re Georgeff, 226 B.R. 852 (Bankr.S.D.Ohio 1998). Regarding the appeal, Mr. Mann maintained the punitive damages award, but was unsuccessful in seeking additional legal fees.

The Plaintiff testified that at some point during the fall of 1998, she was informed by another attorney that a settlement had

been reached between the Defendant and Mr. Georgeff. This information prompted the Plaintiff to call the Defendant on November 3, 1998. After her conversation with the Defendant, the Plaintiff received a phone call from Mr. Mann that same day indicating that the Defendant had been offered only $70,000.00. He requested a reduction in the Plaintiff's fees to induce the Defendant to accept the settlement. The Plaintiff responded that she would consider a reduction, but first she would have to know all of the details, including the amount of the settlement offer, and whether anyone else was taking less.

Subsequently, on November 3, 1998, the Defendant corresponded with the Plaintiff regarding the settlement, and stated:

I wanted to take a few minutes to write to you recapping some of the topics of our telephone conversation of this date. As you are aware, Robert Mann represented me in the Appeal in reference to the above matter, and he had advised me that you telephoned him today and left a voice mail message.... Georgeff has now filed for jurisdiction with the Supreme Court of Ohio; *however, he has tendered an offer which is less than the punitive damage award. Since you need a figure to work with, for the sake of argument it will be $70,000.00 cash. As indicated, I have not seen the settlement offer; however, I need to know what you (will) accept as payment in full for your fees. You requested that you would like to see a copy of the settlement. Unfortunately, part of Georgeff's settlement offer is to keep the terms of the settlement confidential, and therefore I cannot forward a copy to you.* (emphasis supplied).

In December 1998, the Defendant, Mr. Georgeff, and a professional malpractice insurance carrier executed a Settlement Agreement, Release and Covenant of Confidentiality. The agreement called for the immediate payment of $70,000.00 ($30,000.00 from the insurer and $40,000.00 from Mr. Georgeff). Another $30,000.00 was to be paid by Mr. Georgeff to the Defendant in monthly installments commencing March 1, 1999. The total amount payable under the agreement was $100,000.00.

The $70,000.00 in settlement proceeds was received by the Defendant in the form of two bank checks dated December 21 and 22, 1998. They were issued in only the name of the Defendant, contrary to the Addendum. On December 24, 1998, the two checks were deposited at 1st Service Federal Credit Union ("1st Service") where there was a joint account held by the Defendant and her current spouse, Charles W. Bauer ("Mr. Bauer"). This act of depositing the settlement proceeds was taken contrary to the express terms of the Addendum. What follows can only be described as a bizarre and complicated series of transactions to conceal and dissipate this first installment of the settlement proceeds.

Based upon the testimony, the Court finds that the concealment efforts began with the false representation that the settlement was in the amount of only $70,000.00. As detailed above, the settlement amount was actually $30,000.00 higher. The Defendant has been a paralegal for approximately twenty years, and undoubtedly has worked with attorneys and in the court system for a significant period. The malpractice litigation was lengthy, and it involved at least three attorneys. The Court can not find credible the Defendant's representation that she did not know the exact amount of the settlement. Based upon the Court's assessment of her veracity, it finds that she knew the exact amount of the settlement, and further understood that to take a fee reduction an

attorney would have to know at least the bottom line, without regard to any confidentiality agreement. The fact that the second installment was to be paid in the future, would not obviate the need to convey this fact, no matter how speculative.

On the same day that the checks were deposited, the Defendant, again contrary to the Addendum, went on a Christmas Eve spending spree that included the issuance of the following bank checks: (a.) $1,000.00 to Epiphany Lutheran Church as a gift; (b.) $1,000.00 to the Defendant's daughter, Amberly Hannum ("Ms. Hannum") as a gift; (c.) $9,000.00 to Ms. Hannum for her college education; (d.) $10,000.00 to Mr. Bauer as a gift; and, (e.) $24,000.00 to the Defendant, that was later endorsed by the Defendant to Mr. Bauer. Also, on December 24, 1998, the Defendant paid $15,000.00 to Citicorp Mortgage Corp. to extinguish the mortgage on the residence of the Defendant and Mr. Bauer. The record indicates that this residence was transferred to Mr. Bauer by the Defendant prior to her divorce from Mr. Hannum. According to the Defendant's testimony at the meeting of creditors, the consideration included home improvements and curing the mortgage arrearage. Finally, on December 24, 1998, the Defendant issued a regular check to Mr. Mann in the amount of $10,000.00 for his legal fees.

On December 28, 1998, a mere four days after the purchase of the Christmas Eve bank checks, the $9,000.00, $10,000.00 and $24,000.00 bank checks were redeposited into 1st Service. Regarding the $9,000.00 check to Ms. Hannum, the Defendant testified that she never intended for the daughter to have immediate access to the funds. The goal was to preserve them for her education. According to the Defendant, the other two bank checks were redeposited into 1st Service in order to pay taxes related to the settlement proceeds.

Also, on December 28, 1998, the Defendant issued a bank check to Mr. Mann in the amount of $11,000.00 to hold in trust for the Plaintiff's legal fees. The Defendant testified that this amount was calculated based upon the sums she had paid the Plaintiff and the legal fees finally awarded in the Georgeff litigation. The Plaintiff testified, however, that at the time her work was concluded, she was owed approximately $54,000.00.

On January 8, 1999, an Agreed Entry and Partial Satisfaction of Judgment was entered indicating that only the balance of $30,000.00 remained. It was not until late in January 1999, that the Plaintiff was able to take action in the Court of Common Pleas. Specifically, on January 25, 1999, a pre judgment attachment hearing was conducted. On that same day, however, Mr. Bauer withdrew the sum of $34,000.00 from 1st Service in the form of a bank check. At some unknown, later point, the check was cashed by Mr. Bauer at a check cashing company where he was charged $1,000.00. No documentation of this transaction was provided, and Mr. Bauer was not called as a witness to provide corroboration. The balance of $33,000.00 in cash was brought to the Bauer home. It was redeposited into 1st Service on March 8, 1999. Then on that same day, Mr. Bauer withdrew from 1st Service the sum of $29,000.00 in cash.

According to an accounting provided by the Defendant at the trial, from the $29,000.00 in cash Mr. Bauer paid $6,500.00 in cash to an attorney Christopher J. Geer ("Mr. Geer"). The Defendant testified at the trial that this cash was used to pay a judgment lien obtained by a Mr. Vlerebome on the home she transferred to Mr. Bauer. Also, $30.00 in court costs were paid to release this lien. Ac-

cording to the Defendant the lien was related to a business obligation of her former spouse, Mr. Hannum. This testimony, however, is contrary to that given at the meeting of creditors where the Debtor testified that her former spouse, Mr. Hannum, paid the lien. No testimony from Mr. Geer or any of the parties to that lien was provided to corroborate this $6,500.00 cash payment.

Then on March 8, 1999, the sum of $29,370.00, was deposited into a second financial institution, Firstar Bank ("Firstar"). This sum included $1,500.00 from one of the Defendant's pay checks. The Firstar account was only in the name of Mr. Bauer. Several disbursements were made from the proceeds held in the Firstar account, according to the Defendant's accounting. On March 27, 1999, Mr. Bauer issued a check to the U.S. Treasury in the amount of $9,999.00. On April 10, 1999, Mr. Bauer issued a check to the U.S. Treasury in the amount of $8,195.00. Also, on April 10, 1999, Mr. Bauer issued a check to pay school district income tax in the amount of $703.00, and a check to the Treasurer of the State of Ohio in the amount of $1,836.00.

According to the Defendant's accounting, the sums of $2,000.00 and $2,500.00 were also respectively paid to Messrs. Smith and Mann from the proceeds held at Firstar. The Defendant testified that she believes that Mr. Smith may have been paid by check, but that she is unable to recall how Mr. Mann was paid. No testimony from Messrs. Mann or Smith was presented to corroborate these payments.

In the midst of all of these deposits, purchase of bank checks, payments, redeposits and the opening of a new bank account regarding the first installment of the settlement proceeds, the Plaintiff was still pursuing payment before the Court of Common Pleas. On March 5, 1999, a Mag-

istrate's Decision was entered recommending the entry of a preliminary injunction to preclude the cashing of the $34,000.00 bank check and the distribution of the $11,000.00 held in Mr. Mann's trust account. This $11,000.00 is the sum the Defendant asserts she set aside to pay legal fees to the Plaintiff. In the Decision the Magistrate made factual findings substantially similar to those by this Court regarding the disposition of the first installment of the settlement proceeds. The Magistrate concluded:

*The evidence showed that Charles took large sums of money from the account. Some of the money was deposited elsewhere. Within four days of receiving the money, all of it has been disbursed elsewhere.* If that money is totally expended and there is nothing else from which Plaintiff could be compensated, the Plaintiff('s) harm is irreparable and no other remedy would adequately allow Plaintiff to be compensated...*Finally, the most compelling factor to be considered is whether the issuance of the preliminary injunction is to maintain the status quo.... If there ever was a case where there was a need to preserve the status quo, this is one....* (emphasis supplied).

On April 9, 1999, a Journal Entry Overruling Objections And Adopting Magistrate's March 5, 1999, Decision was entered by Judge Deborah P. O'Neill of the Court of Common Pleas. It was concluded:

...(I)t is hereby ORDERED that Defendant Robert J. Mann is hereby restrained from transferring, disbursing or otherwise disposing of all or part of the $11,000.... *It is further ORDERED that Defendant Charles Bauer is hereby restrained from transferring, disbursing or otherwise disposing of all or part of the $34,000 he withdrew from his ac-*

*count on or about January 25, 1999 in the form of a cashier's ...check. Specifically, Defendant Charles Bauer is hereby restrained from cashing, depositing or otherwise negotiating said cashier's ... check.* (emphasis supplied).

On April 13, 1999, approximately three months after receiving the first settlement installment, a Full and Final satisfaction of Judgment was entered indicating that the $30,000.00 balance had been paid. According to the Defendant when she received the final installment of the settlement, it was deposited into a third financial institution, Fairfield National Bank ("Fairfield National"). This account was initially established in the name of Mr. Bauer but was changed to C & M Maintenance. The Defendant explained that at some point she and Mr. Bauer had planned to start a home maintenance company, and that there was already another Charles Bauer with an account at Fairfield National. The Defendant, however, did not present any deposit slip, bank statement or other evidence from Fairfield National to confirm the deposit of the $30,000.00 and to corroborate her testimony. Also, the Defendant testified that she never requested any deposit verification from Fairfield National in order to prepare for the trial.

According to the Defendant's accounting regarding the final settlement installment, between April 10, 1999 and September 10, 2000, thirteen checks in the total amount of $14,793.18 were issued to the Internal Revenue Service and other tax authorities from the Fairfield National account. The checks were as follows:

| Date | Amount | Party |
|---|---|---|
| April 10, 1999 | $1,442.00 | IRS |
| July 10, 1999 | $ 229.31 | IRS |
| July 10, 1999 | $1,586.00 | IRS |
| July 21, 1999 | $ 753.25 | IRS |
| July 21, 1999 | $ 192.12 | IRS |
| September 13, 1999 | $ 890.00 | IRS |
| January 14, 2000 | $1,964.00 | IRS |
| April 13, 2000 | $1,363.00 | IRS |
| April 13, 2000 | $1,743.00 | State of Ohio |
| April 13, 2000 | $ 656.00 | School Tax |
| April 15, 2000 | $1,740.00 | IRS |
| June 13, 2000 | $ 661.50 | IRS |
| September 10, 2000 | $1,573.00 | IRS |

The Defendant also testified that from the $30,000.00 in proceeds the sum of $20,000.00 was paid to the mother of her former spouse, Marilyn Hannum, to settle other litigation. At the meeting of creditors the Defendant testified that Marilyn Hannum commenced a fraudulent conveyance action based upon the transfer of the residence to Mr. Bauer, and to collect an obligation for which the Defendant was liable along with Mr. Hannum. The Defendant testified that the payment included $16,949.00 that remained from the final installment of the settlement proceeds plus borrowed funds. Further, the Defendant testified that the payment was issued from a fourth financial institution, Wright–Patterson Federal Credit Union ("Wright–Patterson") This institution also provided the loan. No documents were presented to support these transactions. The Defendant did not present any corroborating testimony from any of the parties or counsel involved in the litigation.

On March 9, 2001, approximately two years after the final installment of the settlement was received by the Defendant, the Plaintiff obtained a jury verdict against the Defendant in the amount of $62,780.00. Three days later, however, on March 12, 2001, the instant chapter 7 proceeding was filed on behalf of the Defendant at 9:09 a.m. The jury's verdict was entered on that same day at 4:49 p.m. In April 2001, approximately a month after the Defendant filed the instant bankruptcy case, the home that the Defendant transferred to Mr. Bauer was sold. From this sale, Mr. Bauer realized net proceeds in excess of $100,000.00. The instant adversary proceeding was commenced on July 23, 2001.

The Plaintiff seeks to not only block the discharge of the jury verdict, but also requests the more comprehensive remedy of a denial of discharge of all obligations. These two remedies have some elements in common, and may be established from the same set of circumstances. Because they are vastly different in their impact upon debtors and creditors, however, the two remedies will be separately addressed.

■ Turning first to the dischargeability issues, the Plaintiff has sued under sections 523(a)(2)(A) (false pretenses and false representations) and 523(a)(4) (fiduciary fraud, larceny and embezzlement). In all dischargeability litigation creditors must prove their case by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To establish a violation of section 523(a)(2)(A) it must be shown that:

1. the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;

2. The debtor intended to deceive the creditor;

3. The creditor justifiably relied on the false representation; and

4. Its reliance was the proximate cause of the loss.

*In re Rembert,* 141 F.3d 277, 280–281 (6th Cir.1998); *cert. denied* 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998).

■ False pretenses have been defined as conduct intended to give a false impression. *In re Hoover,* 232 B.R. 695, 700 (Bankr.S.D.Ohio 1999). Since debtors are unlikely to admit their intent to deceive, it may be inferred from their actions at the time of and subsequent to the loss. The function of the Court is to, "...consider whether the circumstances, as viewed in the aggregate, present a picture of decep-

tive conduct by the debtor which indicate an intent to deceive the creditor." *In re Patrick,* 265 B.R. 913, 916–917 (Bankr. N.D.Ohio 2001); *In re Monfort,* 276 B.R. 793, 796 (Bankr.N.D.Ohio 2001); *In re Hoover,* at 700.

■ The creditor must establish "justifiable reliance" on the representations. This standard is significantly less stringent than the "reasonable reliance" criterion imposed by section 523(a)(2)(B) (false financial statements). It is a subjective standard, "...that takes into account the interactions between and experiences of the two parties involved.... (It) is a 'fact sensitive standard' that depends on 'the circumstances of the ...case, rather than of the application of a community standard of conduct to all cases.'" Jeffrey R. Priebe, "Field v. Mans and In re Keim: Excepting Debts From Bankruptcy Discharge and the Difference Between 'Experienced Horsemen' and 'Reasonable Men,'" 54 Ark. L.Rev. 99, 109–110 (2001). (citations omitted). Finally, the creditor must establish proximate causation, which is demonstrated by conduct that is a substantial factor in the loss, or where the loss may be reasonably expected to follow. *In re Hoover,* at 700.

■ Regarding the second dischargeability challenge (sec.523(a)(4) fiduciary fraud, embezzlement and larceny), the creditor must prove: (1) the creation of an express trust regarding the funds; (2) that the debtor acted in a fiduciary capacity; and (3) the debt is based upon the debtor's fraud or defalcation while acting in a fiduciary capacity. *In re Pomainville,* 254 B.R. 699, 702 (Bankr.S.D.Ohio 2000). The express trust must govern particular property, and is established by a manifestation of intent to confer equitable duties to act for the benefit of others. *In re Pomainville,* at 702–704. While the embezzlement and larceny components of

section 523(a)(4) are not premised upon a fiduciary relationship, the funds must have been taken for an unintended purpose, and the circumstances must indicate fraud. *In re Pomainville*, at 704–706.

Examining the facts in this case, the Court has concluded that section 523(a)(4) is not applicable. While the Addendum to the fee agreement expressly provided that any settlement check should be issued in the names of the Plaintiff and the Defendant, and should be turned over immediately to the Plaintiff, the Court can not find these facts sufficient to establish an express trust. Also, it is not possible to find embezzlement or larceny since the settlement proceeds were paid directly to the Defendant by Mr. Georgeff and his insurer.

On the other hand, the Court does conclude that section 523(a)(2)(A) is applicable, and that the Plaintiff has sustained her burden of proof by a preponderance of the evidence.[1] While the execution of the Addendum is very important, the relevant period is much later in the relationship between the Plaintiff and the Defendant. The circumstances that establish fraud commenced when the settlement was reached and the Plaintiff learned from a third party of its existence. At this critical point rather than honoring the express terms of the Addendum and being candid with the Plaintiff, the Defendant engaged in a combination of misrepresentations and false impressions to hide and dissipate the settlement proceeds before the Plaintiff could protect her interests through judicial means.

First, the Defendant failed to turn over the proceeds to the Plaintiff as required by the Addendum. Second, when the Plaintiff learned of the settlement, the Defendant only disclosed the first installment of the settlement proceeds ($70,000.00). Third, in this process the Defendant directly and through her new attorney engaged in efforts to persuade the Plaintiff to take a fee reduction, and she used the confidentiality requirements of the settlement as the excuse not to disclose the exact amount. Fourth, immediately upon receipt of the first installment ($70,000.00), the Plaintiff engaged in a complicated series of deposits, purchase of bank checks and redeposits involving two financial institutions in the Columbus area. Substantial sums were paid out on Christmas Eve by bank checks, and substantial sums were held in cash and paid to others in cash.

All of this activity took place even in the face of the requirements of the Addendum and the fact that Plaintiff was in the process of, and ultimately obtained, an injunction to stop further disbursements from the first installment. All of these facts lead the Court to conclude that the Defendant intended to deceive the Plaintiff, and to make sure that only a limited sum ($11,000.00) would ever be paid to the Plaintiff who obtained the judgment.

With reference to the second installment of the settlement proceeds ($30,000.00) the same pattern of fraud was followed. First, there was no attempt to notify the Plaintiff of the existence or receipt of the funds contrary to the Addendum. Second, once they were received, they were deposited

---

1.  This section provides:

    (a) A discharge under section 727 ... of this title does not discharge and individual debtor from any debt—

    . . .

    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
    (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

into a third financial institution, Fairfield National, contrary to the Addendum. Proof of deposit, however, was never produced at the trial. Finally, the Defendant followed the same pattern of dissipating the proceeds through alleged disbursements to pay her tax obligations and to pay a judgment obtained by her former mother-in-law, through a fourth financial institution, Wright–Patterson.

Regarding the elements of justifiable reliance, when the Plaintiff learned of the settlement from the third party she immediately talked to the Defendant and her new attorney, Mr. Mann. At that time she was drawn into discussions on whether she would be willing to take a fee reduction in order to induce the Defendant to accept, "the $70,000.00 settlement offer." She even received a lengthy letter from the Defendant explaining the settlement, and asking for a reduction.

At this point the Plaintiff could have taken decisive legal action to protect her interests regarding the first and second installments of the settlement proceeds. In examining these facts, the Court concludes that the Plaintiff justifiably relied on the false representations and impressions given that before any funds were paid to the Defendant, some fee arrangement would be negotiated. Finally, regarding the element of proximate causation, but for these efforts to engage the Plaintiff in a fee reduction dialogue and to hide the fact that the settlement included an additional $30,000.00, the Plaintiff may have been able to intercept both the first and second installments. This would have prevented or mitigated her loss. For all of these reasons, the Court concludes that the obligation should not be discharged, pursuant to section 523(a)(2)(A) of the Code.

■ Turning to the objections to discharge, the Plaintiff has sued under sections 727(a)(2)(A), (3) and (5). Objections to discharge are strictly construed against the moving party and liberally in favor of debtors to foster the "fresh start" goal of the Code. *In re Gannon,* 173 B.R. 313, 316 (Bankr.S.D.N.Y.1994); *In re Stanke,* 234 B.R. 449, 456 (Bankr.W.D.Mo.1999). Creditors must prove their case by a preponderance of the evidence. *In re Gannon,* at 317; *In re Stanke,* at 456; *In re Adams,* 171 B.R. 298, 303 (D.W.D.Tenn. 1992), *aff'd* 31 F.3d 389 (6th Cir.1994), *cert. denied* 513 U.S. 1111, 115 S.Ct. 903, 130 L.Ed.2d 786 (1995); FRBP 4005.

In the instant case, the Court has concluded that it is not possible to fully determine whether section 727(a)(2)(A) may be applied. That provision relates solely to concealment efforts that took place within a year prior to the bankruptcy filing. Many of the transfers in this case may be outside the statutory period. Also, some significant transactions were in cash, or are otherwise not identifiable by any date. On the other hand, sections 727(a)(3) and (5) appear applicable to the facts in this case.[2]

■ To establish a violation under section 727(a)(3) the creditor must show

---

2.  Section 727(a)(3) and (5) provide in relevant part as follows:

   (A) The court shall grant the debtor a discharge, unless—

   . . .

   (3) the debtor has concealed, destroyed, mutilated, falsified, *or failed to keep or preserve any recorded information, . . . from which the debtor's financial condi-*tion or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

   . . .

   (5) *the debtor has failed to explain satisfactorily, . . . any loss of assets or deficiency of assets to meet the debtor's liabilities;* . . . (emphasis supplied).

initially that the books and records are inadequate, and then the burden of production shifts to the debtor to explain the deficiencies. *In re Wynn*, 261 B.R. 286, 299 (Bankr.M.D.Ala.2001). The goal of the Code is to ensure an accurate presentation of the debtor's financial condition in exchange for a discharge. *In re Wynn*, at 299. While there is no statutory requirement that debtors maintain particular types of records, or that they are maintained in perfect condition, they must be sufficient to identify transactions to answer creditors' inquiries. *In re Wynn*, at 299–300.

■■■■■ There must be written evidence of a debtor's present financial condition and for a reasonable period in the past. *In re Wynn*, at 300. The factors considered by courts include: a. the debtor's educational background and level of sophistication; b. the debtor's financial structure; and (c) the debtor's business experience, and the size and complexity of any business. *In re Wynn*, at 300; *In re Strbac*, 235 B.R. 880, 882 (6th Cir. BAP 1999).

■■■■■ To establish a violation of section 727(a)(5), the creditor must produce evidence that the debtor had an interest in identifiable property for a reasonable period before filing. The mere allegation of a loss is not sufficient. *In re Mezvinsky*, 265 B.R. 681, 689 (Bankr.E.D.Pa.2001). Once the creditor has satisfied this initial burden of going forward, then the burden of production shifts to the debtor to satisfactorily explain losses or deficiencies. *In re Mezvinsky*, at 689; *In re O'Bryan*, 246 B.R. 271, 279 (Bankr.W.D.Ky.1999). Courts are not to be concerned with whether any disposition has been proper, but whether the explanations provide satisfactory descriptions of what happened. *In re Mezvinsky*, at 690. It is therefore incumbent upon debtors to gather and produce documents that they might not ordinarily keep, including the employment of accountants to explain losses. *In re Mezvinsky*, at 690–691.

■■■■■ Based upon a review of the testimony and other evidence, including an assessment of the relative credibility of the witnesses, the Court has concluded that the Plaintiff has sustained her burden under sections 727(a)(3) and (5). Four factors have been most persuasive to the Court.

First, the Defendant received the sum of $100,000.00 in two installments on December 24, 1998, and on or about April 13, 1999. Since January 1999, the Defendant has been pursued by the Plaintiff to obtain an accounting of the disposition of the proceeds and payment. The Plaintiff's collection efforts resulted in a judgment that was entered on the same day of the bankruptcy filing. The Defendant filed this bankruptcy proceeding to obtain a discharge in exchange for a complete and candid disclosure of her financial affairs. The instant adversary proceeding was commenced on July 23, 2001, and the Defendant became bound by the Federal Rules of Bankruptcy Procedure, that impose significant discovery requirements. Despite the passage of all this time and opportunities to fully account for the proceeds, today the disposition of all of the settlement proceeds remains a mystery.

Second, the mystery involves the use of at least four financial institutions (1st Service, Firstar, Fairfield National and Wright–Patterson). The mystery includes the purchase of bank checks, the cashing of a $34,000.00 bank check where the cash is then taken home for days and then redeposited. Large payments were made in cash or by other means without out any corroborating documents or testimony. For example, the Defendant testified that

sums were paid to three attorneys, Messrs. Geer, Smith and Mann. No corroborating testimony was provided. Surely attorneys who were involved in litigation with the Defendant, and in two instances represented her, could have been persuaded or compelled to provide proof. In addition, regarding the payment that may have been made to Mr. Geer, it is the subject of conflicting testimony. During the meeting of creditors the Debtor testified that the obligation was paid by her former spouse, Mr. Hannum.

The disposition of the last installment of $30,000.00 remains the greatest mystery. The Defendant testified that this money was placed into an account of Mr. Bauer and/or C & M Maintenance at Fairfield National. Despite the fact that this money has been the subject of litigation for more than three years, at trial no deposit slip was provided. The Defendant did provide some accounting that indicates that checks approximating $14,793.18 may have been written to pay tax obligations. The Defendant, however, also testified that another $20,000.00 was paid to her former mother-in-law from a Wright–Patterson account. No corroborating evidence for this payment was provided.

Third, based upon a review of the evidence the Court has concluded that we may never know the true disposition of all of the settlement proceeds, and what, if any, balance remained. Many documents offered into evidence are copies that are not fully legible, and some records are redacted. The Defendant's testimony is extremely vague on dates and the specifics of transactions. She relies too heavily on her move to Florida, two automobile accidents and the confidentiality agreement with Mr. Georgeff, to excuse her lapse. The Defendant did not introduce any tax returns to confirm the receipt and disposition of the settlement proceeds.

Fourth, the Defendant is not the ordinary debtor that comes before the Court to obtain a discharge. She has been a debtor in two bankruptcy proceedings, and is a paralegal. The Defendant has been involved in at least three law suits that have been discussed in this Order, as well as two personal injury actions. She has retained the services of at least six attorneys, filed a pro se malpractice action, orchestrated the transfer of her residence to her current spouse, Mr. Bauer, and assisted in efforts to circumvent judicial process to recover some of the proceeds in Common Pleas Court.

Surely, with all of this background and extensive contact with the legal system, the Defendant should understand the need to maintain and produce credible evidence of the disposition of $100,000.00. Instead, the picture that has been painted is not that of a confused, unsophisticated debtor who honestly comes before the court to receive a "fresh start," but rather one who has engaged in obfuscation and deceit to abuse the bankruptcy privilege.

All of these facts lead the Court to conclude that the Defendant has failed to maintain records from which her financial condition could be ascertained, and she has failed to satisfactorily explain the disposition of all of the settlement proceeds. The only excuse offered by the Defendant is that she may have been involved in automobile accidents, and that some records may have been lost in her move to Florida. Given the fact that the disposition of the proceeds has been at issue for more than three years, and the availability of means to obtain records from the banks or the parties involved, the excuses offered are not persuasive.

Accordingly, the Court has also concluded that the Defendant has failed to provide a complete and accurate disclosure of her

financial affairs, and she is not entitled to a discharge.

It is so ordered.